ALASKA AIRLINES, INC., Appellant,

v.

Milford Douglas SWEAT and Diane M. Sweat, Appellees.

Milford Douglas SWEAT and Diane M. Sweat, Cross-Appellants,

v.

ALASKA AIRLINES, INC., an Alaska Corporation, and Chitina Air Service, Inc., an Alaska Corporation, Cross-Appellees.

Nos. 2912, 3103.

Supreme Court of Alaska.

July 22, 1977.

As Amended on Denial of Rehearing Aug. 25, 1977.

918

920

Sanford M. Gibbs, Charles W. Hagans, Hagans, Smith & Brown, Anchorage, for appellant and cross-appellees.

Kenneth D. Jensen, Jeffrey H. Roth, Jensen, Harris & Roth, Anchorage, for appellees and cross-appellants.

Before BOOCHEVER, C. J., RABINOW-ITZ, CONNOR and BURKE, JJ., and DI-MOND, J. Pro Tem.

## OPINION

BOOCHEVER, Chief Justice.

This appeal arises out of a judgment in favor of Milford Douglas Sweat against Alaska Airlines for injuries sustained in an airplane crash. Sweat was a passenger aboard a Chitina Air Service plane which encountered a "whiteout" and crashed on the Bering Glacier. Chitina is licensed as an air taxi by the State of Alaska, but at the time in question, was engaged under a contract with Alaska Airlines, Inc. in servicing a portion of Alaska Airlines' regularly scheduled route. The crash was attributed to pilot error. The parties have raised numerous and often multi-faceted issues. Alaska Airlines (Alaska) claims that:

1. As a matter of law, it cannot be held vicariously liable for Chitina's negligence.

2. The trial court was precluded from entering summary judgment since federal regulations pre-empt the subject of air carriers and substituted service.

3. Sweat's settlement with Chitina released Alaska Airlines.

4. Summary judgment on liability was improperly granted since the question of whether Sweat was a passenger of Chitina's as an air taxi or under its contract with Alaska Airlines presented an issue of fact.

5. The trial court erroneously admitted and considered a new federal regulation—ER–946, without adequate notice to counsel, and this regulation introduced a factual issue involving Chitina's financial responsibility which was incapable of resolution by summary judgment.

6. Cross-examination of Sweat's expert witness on damages was improperly limited.

7. Witnesses of Alaska were improperly excluded.

8. Alaska was denied a fair and impartial trial.

9. Damages were improperly assessed in that:

(a) Future retirement benefits were awarded without reduction to present value.

(b) Lost future earnings should have been reduced to present value.

(c) An award for loss of health, welfare and legal benefits should not have been allowed.

Sweat has cross-appealed contending that the trial court erred in:

1. Limiting pre-trial loss of health, welfare and legal benefits to $1,000.00.

2. Limiting future loss of such benefits to $10,000.00.

3. Finding that Sweat's earning capacity on post-accident employment was $10.00 an hour with an increase to $12.00 an hour within five years.

4. Finding that Sweat could earn alternative retirement benefits in his new job valued at $50,000.00 and deducting this amount from his lost retirement benefits.

5. Awarding only $50,000.00 attorney's fees and not supporting the deviation from Civil Rule 82(a)'s schedule with specific reasons.

We affirm the trial court's award of summary judgment on liability but hold that there was error in limiting cross-examination of Sweat's expert witness and in various aspects of the award of damages. Additionally, the court should have set forth reasons for its deviation from the attorney's fee schedule of Civil Rule 82(a).

## I. STATEMENT OF FACTS

At the time of the crash, Douglas Sweat was an electrical lineman employed by ITT Arctic Services. Dispatched through his union, he left Anchorage on January 14,

1974 for Cordova on an Alaska Airlines flight. After performing work in Boswell Bay, Sweat returned to Cordova on Saturday, January 19 and then planned to proceed to Cape Yakataga on a Chitina plane on the same day. Sweat's ticket to Cordova, Boswell Bay and Cape Yakataga was written on Alaska Airlines ticket stock.

The Chitina plane encountered deteriorating weather conditions over the Bering Glacier, and the pilot attempted to turn and return' to Cordova. During this turn, the pilot experienced "whiteout" conditions and crashed on the Bering Glacier.

As a result of the crash, Mr. Sweat suffered injuries requiring fusion of the fourth and fifth lumbar vertebra and the sacrum, a paralyzed left leg, severe muscular atrophy of various muscles and extensive nerve damage. Sweat and his wife sued both Chitina Airlines and Alaska Airlines on May 30, 1974 alleging causes of action in contract and tort.

Alaska Airlines is authorized by the federal Civil Aeronautics Board (C.A.B.) to fly scheduled routes. This C.A.B. authorization creates a franchise of Alaska for those scheduled routes. Alaska also has authority to deliver United States mail on its scheduled flights.

Chitina is a corporation independent of Alaska Airlines. It is licensed by the State of Alaska to perform charter operations. Chitina has no independent authority to fly scheduled routes in Alaska or to carry United States mail.

Alaska Airlines is permitted by the C.A.B. to contract with other companies to service a part of its scheduled route. In May 1968, Alaska entered into a service contract with Wayne Smith, d/b/a Chitina Air Service. Under this agreement, Chitina agreed to carry mail and passengers over various of Alaska's scheduled routes, including Cordova to Cape Yakataga.[1] Chitina also agreed to carry insurance in the amount of $50,000.00 per passenger, $50,000.00 property damage and $50,000.00 bodily injury.[2]

There is no indication that Alaska Airlines controls the maintenance of the planes, the hiring of pilots or the day-to-day affairs of Chitina. However, Alaska Airlines provides the schedule, the tickets and rates, and Chitina then charges Alaska Airlines an hourly rate. It is undisputed that the ticket issued to Douglas Sweat was an Alaska Airlines ticket, and Alaska Airlines admits that Sweat paid the scheduled fare. It is further admitted by Alaska Airlines that:

> The flight on which Cessna 180, N9035M crashed on January 20, 1975 with Milford Douglas Sweat aboard was deemed by Alaska Airlines as Alaska Airline Flight Number 54.[3]

1. The agreement was amended in May of 1970 to reflect the incorporation of Chitina Air.

2. Chitina further agreed to "indemnify and hold harmless" Alaska Airlines for any liability arising from the substitute service.
Under the contract, it is stated that:
Should Chitina be unable to provide service in accordance with Alaska's published schedules or trip requests due to weather or field conditions, Chitina will provide service on the first flyable day thereafter or when airport conditions permit.
The contract establishes that Chitina pick up all tickets and waybills. It bills Alaska Airlines for services rendered. "[A]ll traffic moved by Chitina over the scheduled points on Alaska's system, shall be at the rates as published by Alaska, . . ." Alaska Airlines agreed to furnish Chitina tariffs and other necessary information as well as the necessary instructions for the carriage of the mail and operations of

flights as required by the post office. The contract requires compliance by Chitina with Federal Aviation Administration regulations and that Chitina follow Alaska Airlines' schedules in a safe manner so as not to endanger "persons, property or mail being carried under this agreement." Chitina agreed to land at designated points "weather permitting," if it can be done without "endangering the aircraft or its contents." Alaska Airlines has the right to terminate the contract among other reasons for "failure to provide adequate services . . ." with thirty days notice to correct.

3. At the time of this flight, Sweat testified that he thought the plane was owned by Alaska Airlines. While Alaska did attempt to show that Sweat had previously chartered Chitina privately, Sweat did not recall that his previous experiences were with "Chitina" as opposed to Alaska Airlines. Testimony indicates that the flight on Saturday the 20th was the scheduled

The flight also was carrying United States mail.

Chitina Air and the Sweats entered into a "covenant not to sue" and stipulation dismissing the claim against Chitina with prejudice. Both the stipulation and the covenant not to sue specifically stated that the settlement did not include a release of Alaska Airlines.

As the sole remaining defendant, Alaska Airlines moved for summary judgment on the following points: (1) Alaska could not be vicariously liable for Chitina's acts since Chitina was an independent contractor and public policy does not support vicarious liability; and (2) if Alaska could be vicariously liable, then as a matter of law, the release of Chitina automatically released Alaska. The Sweats filed an opposition to Alaska's motion and a cross-motion for partial summary judgment. They claimed that as a matter of law, Alaska was vicariously liable under Restatement (Second) of Torts § 428 (franchise holder) or, alternatively, under the Restatement (Second) of Agency § 314.

In a written decision, Superior Court Judge Seaborn J. Buckalew, Jr. granted the Sweats' motion for summary judgment. The trial court further held that the settlement did not release Alaska.

In deciding the summary judgment motion on March 5, 1976, the trial court considered ER–946, a recently-passed federal regulation.[4] The regulation was brought to the attention of the court and opposing counsel for the first time during oral argument on the summary judgment motion. Alaska had claimed that the federal government's approval of the Chitina subcontract indicated its approval of Chitina's financial independence, and obviated any public policy for imposing vicarious liability. At the oral argument for summary judgment, the Sweats introduced the regulation to rebut that contention, and at that time, counsel for Alaska Airlines made no objection.[5]

The case proceeded to trial before Judge Blair on the issues of negligence and damages.[6] At trial, an expert economist for the

4. ER–946 (found in full at R. 319) is an addition to the C.A.B. economic regulations entitled "Operations by Air Taxis in Alaskan Bush Routes Pursuant to Subcontract Agreements with Certified Air Carriers." This regulation has to do with the requirements of C.A.B. approval of subcontracts filed for substitute air taxi service. Section 293.4(e) of that regulation provides:

> The traveling public affected by the agreement shall be informed by appropriate and conspicuous notice that the air taxi party is operating as an agent of the certified air carrier party and that the certified air carrier is responsible for the services rendered.

The rationale behind this regulation is found in the comments preceding the regulations:

> flight of Friday the 19th and was not an independent charter. This was indicated in the testimony of the pilot Fejes. It is undisputed that the plane carried mail, and in an answer to a requested admission, Alaska Airlines appears to have conceded the flight of the 20th was scheduled Flight No. 54. The trial court in summary judgment presumed that this fact was uncontested, stating:
>
> > It is uncontroverted that at the time of the incident, Milford Douglas Sweat was a revenue fare passenger on a regularly scheduled flight between Cordova and Cape Yakataga, in an aircraft owned and operated by Chitina Air Service, Inc.

> Insofar as Wien objects to the term "agent" in that section, as raising complex legal questions, suffice it to say that a fundamental principle of our approach to these contracting arrangements is that the certificated carrier retains full primary responsibility for serving its route and we insist that, despite existence of a subcontract, the continuing responsibility of the certificated carrier must be reflected in its principal/agent relationship with the subcontractor . . . .. (footnote omitted)

5. In his written decision Judge Buckalew rejected Alaska's claim that the C.A.B. had approved of Chitina's economic independence and referred to ER–946 in support. It does not appear that the finding of vicarious liability even rested in part on this point. Following the decision, Alaska Airlines brought a motion for a continuance before Judge Moody, claiming the "reliance" of Judge Buckalew on ER–946 was erroneous and that Alaska Airlines needed time to rebut the implications of ER–946. At hearing, Alaska Airlines admitted it had not asked Judge Buckalew to reconsider the summary judgment motion. The motion for continuance was denied.

6. Summary judgment was before Judge Buckalew. Motions for continuance were decided by Judge Moody, and the case was tried by Judge Blair. Judge Buckalew ordered the case to be tried on the issues of:

Sweats testified as to the basis for calculating lost past income and future income and labor benefits. As a result of the accident, Sweat was unable to return to his job as a journeyman lineman. He was able, however, to obtain work as a draftsman with an engineering firm. The new job, which was less physically demanding, paid less and had less benefits. The expert testimony centered around the difference between the projected lost income and benefits of Sweat's old job and the income and benefits of Sweat's new job.

The trial court limited Alaska's cross-examination of Sweat's expert economist. It found the cross-examination outside the scope of direct examination and stated that if counsel wanted to develop his contentions, he could do so with his own witnesses during his own case. The trial court's decision to limit cross-examination forms the basis for one point of appeal.

Later in trial, Alaska did try to introduce evidence of lost income and benefits through its own expert economist. Counsel for the Sweats made timely objection on the grounds that: (1) the expert was a

surprise witness who was not on the witness list, and the opportunity for pretrial discovery had been denied; (2) counsel for Alaska had seen the Sweats' summary of damages well before trial and the Sweats' expert witness was on the witness list, so Alaska had had ample opportunity to depose the expert and to secure its own economist and (3) the Sweats relied to their detriment on a court conference the previous day where the scope of Alaska's case was discussed. Alaska had not mentioned its expert economist in the conference, counsel for the Sweats had released their expert to return to Montana and the expert was therefore unavailable to rebut evidence from Alaska's economist.

The court ruled Alaska could not call the expert witness.[7] This denial forms another point of appeal.

Subsequent to this ruling, Alaska attempted to introduce the testimony of Ernest Gillam. To impeach Sweat's testimony to the contrary, Gillam allegedly would have testified that in the past Sweat had hired Chitina Air Service rather than ap-

---

tortious conduct, causation, injury and extent of damages. Furthermore, at trial, the plaintiff may present evidence to prove, and the defendant evidence to disprove, the existence of defendant's vicarious liability on the basis of the "reasonable belief" doctrine expressed in Restatement of Torts 2d § 429 or the "responsible control" rule expressed in *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933 (Alaska 1968).

7. On the issue of the expert economist, the court ruled as follows:

THE COURT: Well, I find myself on the horns of a dilemma in this one because I did . . . limit the testimony with the statement that I would allow Mr. Hagans to put on his own witness in his own case in chief, but I didn't consider the witness list problem at that time. . . . Under the facts of this case and the way it has proceeded the court questioned fairly lengthily yesterday as to what witnesses were left and who would testify today, I received the name of Mr. Shackleton and Mr. Steige, considerable discussion as to whether Dr. Heliker would stay over, would not stay over, and the court didn't rule on that question as to whether costs should be imposed if he did stay over. There was no indication yesterday afternoon when we recessed to give the defendant the

opportunity to get the witnesses it indicated it wished to call, that Mr. Engelman would be called or that any other economist would be called this morning. He's not listed on the witness list and under the circumstances of this case, a combination of not listing him on the witness list and not giving some notice to counsel so that he could hold his own economist in Anchorage for the purpose of rebutting or commenting upon whatever testimony Mr. Engelman might bring in, it's the finding of the court that it would indeed be prejudicial to the plaintiff and in violation of the rules of discovery to allow this economist to testify at this time. Now, I would quite possibly have a different finding on that had we had this man's name yesterday and based upon what I had said earlier. If Mr. Hagans indicated that an economist would testify this morning or that he intended to have one and had plaintiffs then had an opportunity to retain their own expert witness the probabilities are that I would have allowed Mr. Hagans to put this witness on based upon the— simply paying whatever additional costs there would be involved in holding Heliker over for the one day. However, that was not done. Since it was not done I find that there would be prejudice to plaintiffs and will not allow the testimony.

proached them as a carrier on a scheduled route. The trial court refused to permit the witness to testify on the grounds that he was not listed on the witness list, and that his testimony would constitute impeachment on a collateral issue. This also forms a point of appeal.

At trial, the parties stipulated that total hospital and medical expenses up to January 14, 1976 (pretrial) were $18,287.37. The trial court found total damages of $994,-334.00 from which the Chitina settlement of $118,500.00 was deducted.

Although both Alaska and Sweat appeal from portions of the trial court's findings on damages, no claim is made that damages are "excessive as a matter of law." All issues of damages go to the *methods* of calculation.

## II. VICARIOUS LIABILITY

Judge Buckalew, in his well-reasoned opinion on this issue, based his holding of liability primarily on Restatement (Second) of Torts § 428 which states:

*Contractor's Negligence in Doing Work Which Cannot Lawfully be Done Except Under a Franchise Granted to His Employer*

An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity.[8]

Alaska argues that air travel does not involve an unreasonable risk of harm to others and, further, that the reasons for the Restatement's provision are inapplicable. It points out that Chitina, although not regulated as a federally certificated scheduled common carrier, was nevertheless certificated as an air taxi under the Air Com-

merce Act of Alaska and had authority from the Federal Aviation Administration to serve as an air taxi/commercial operator. Thus, Chitina was subject to regulations pertaining to safety and financial responsibility. It is not contended, however, that Chitina was subject to the regulations applicable to Alaska as a scheduled common carrier.

We agree with Alaska that air travel may no longer be regarded as inherently dangerous and that generally, flights aboard certificated carriers do not involve an unreasonable risk of harm. The Restatement, however, is careful to explain what is meant by the term "unreasonable risk of harm" in the franchise context. Comment (a) states:

The rule stated in this Section is principally applicable to public service corporations which, as such, are permitted by their franchise to use instrumentalities which are peculiarly dangerous *unless carefully operated.* (emphasis added)

We doubt that even the most ardent advocate would contend that flights of Alaskan air taxis are not "peculiarly dangerous unless carefully operated." But we do not base our affirmance on construction of the Restatement and its comments. In *Sloan v. Atlantic Richfield Co.,* 552 P.2d 157, 160 (Alaska 1976) we stated:

[The Restatements] are useful tools in the task of establishing principles of the common law. But we decline to approach our traditionally case-based jurisprudence as though it emanates from the Restatements like a code, however scholarly the preparation. The Restatements are indeed reflective of the development of the common law, but they are not determinative.

Professor Prosser, discussing the concept of nondelegable duties, has stated:

It is difficult to suggest any criterion by which the non-delegable character of

8. The Sweats also relied on Restatement (Second) of Agency § 214 in support of their argument. Comment (b).to § 214 entitled "Action Illegal Unless Licensed" states:

When a license is required for the performance of acts, one having a license who dele-

gates performance of the acts to another is subject to liability for the negligence of the other.

The trial court did not discuss this theory in its decision, and it appears to overlap with that of § 428.

such duties may be determined, other than the conclusion of courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another.[9]

We believe that the responsibility of a common carrier for the safety of its passengers is so important that the carrier should not be permitted to transfer it to another. A scheduled common carrier such as Alaska is given a monopoly or semi-monopoly primarily for the purpose of furnishing safe and reliable scheduled air transportation. It should not be permitted to barter away its responsibility to the traveling public by means of contracts with other carriers. If this were permissible, an air carrier could avoid liability by engaging in independent contracts for furnishing food, maintenance of its planes and conceivably even for supplying crews. Regardless of whether such contracts may be permitted by regulatory authorities, the traveling public is entitled to look for protection to the certificated carrier responsible for the scheduled route.

■ Alaska contends that there has been no showing that Chitina lacks sufficient assets to cover the Sweats' losses. To paraphrase *Hamlet,* "Alaska doth protest too much, methinks."[10] Without ruling on an issue which is not before us, it would seem that, barring some defense not readily apparent, if Chitina is financially responsible, Alaska may secure indemnity under its agreement expressly so providing.[11] But Chitina's financial responsibility is not in issue. Alaska is liable to its passengers for injuries sustained due to negligence in the operation of its scheduled route, and such liability is not contingent on whether or not an alleged independent contractor is finan-

cially responsible. When Alaska entered into its contract with Chitina, it could have inserted an adequate provision for insurance or required other evidence of financial responsibility. It cannot foist that burden on its passengers. The basis for our holding is not dependent upon a factual showing pertaining to the financial responsibility of the independent contractor. For similar reasons, we hold that Alaska may not avoid its responsibility to its passengers because Chitina is subject to certain safety regulations. The passengers were entitled to look to Alaska for protection.

■ Our conclusion that Alaska cannot avoid responsibility in this case is consistent with long-established authority involving other types of common carriers. In *Bates Motor Transport Lines v. Mayer*, 213 Ind. 664, 14 N.E.2d 91 (1938), Bates, a motor freight common carrier was held liable for injuries caused by the negligence of its contractor in hauling freight over Bates' scheduled route. In *Southern Railway Co. v. Hussey*, 42 F.2d 70 (8th Cir. 1930), a passenger was injured when a switch was improperly operated. The railroad company was held liable despite the fact that the switch was operated by an independent contractor. More directly in point is the case of *Rozmajzl v. Northland Greyhound Lines*, 242 Iowa 1135, 49 N.W.2d 501, 505 (1951), which involved injuries to a passenger on a bus owned and operated by a company contracting with Northland. The court held that "Northland could not evade its duty to its passengers by engaging its co-defendant to perform that duty."[12]

## III. FEDERAL PRE–EMPTION

Alaska also contends that the granting of a summary judgment on the issues of liabil-

---

9. Prosser, Law of Torts, ch. 12, § 71 p. 471 (4th ed. 1971). *See also* 2 Harper & James, Law of Torts, § 26.11 p. 1406 (1956).

10. *See Hamlet,* act. III, sc. ii.

11. In *Northwest Airlines v. Alaska Airlines,* 343 F.Supp. 826 (D. Alaska 1972), Northwest was held entitled to indemnity from Alaska under the terms of a similar agreement. Northwest had settled suits brought by personal representatives of Alaska's crew alleging that deaths were attributable to Northwest's negligent

maintenance and operation of the Shemya Airport. In a separate trial, Northwest was found not to have negligently operated the airport so as to cause the crash.

12. *See Mann v. Virginia Dare Trans. Co., Inc.,* 283 N.C. 734, 198 S.E.2d 558 (1973); *Dixie Stage Lines v. Anderson,* 222 Ala. 673, 134 So. 23 (1931); *Cotton v. Ship-by-Truck Co.,* 337 Mo. 270, 85 S.W.2d 80 (1935); *cf. City of Chicago v. Murdoch,* 212 Ill. 9, 72 N.E. 46 (1904); *Murray v. Lehigh Valley R. Co.,* 66 Conn. 512, 34 A. 506 (1895). We also note a line of Cali-

ity constitutes a direct interference in the federal government's regulation of air carriage. Basically, Alaska argues that the summary judgment was in part based on the "enterprise benefit" rationale for imposing vicarious liability adopted by this court in *Fruit v. Schreiner*, 502 P.2d 133, 140–42 (Alaska 1972). In holding a non-negligent employer liable for the negligent acts of its employee, *Fruit* noted that under the doctrine of respondeat superior, the risk of injuries is shifted from the injured person to the public by increases in the price charged by the enterprise. Since the rates of certificated scheduled carriers are regulated by the C.A.B., Alaska contends that action by a state court is precluded by federal pre-emption.

We have upheld the summary judgment, however, on grounds not dependent on the enterprise theory. As Alaska recognizes, the doctrine of federal pre-emption of aviation law does not generally extend to tort liability. In its brief, Alaska states:

> With the exception of the Warsaw Convention and Montreal Agreement, the Board has made no effort to legislate the carrier's liability for personal injury in negligence cases. The C.A.B.'s authority over economic regulation does not extend that far. *See*, 49 U.S.C.A., § 1302. The tort liability of Alaska under state law, judicially created, unless conflicting with federal regulatory policy, is not a matter of legislative concern to the C.A.B. *Cf., Cushman Motor Delivery Co. v. Bernick*, 55 Ohio App. 31, 8 N.E.2d 446 (1936). (footnote omitted).

Moreover, in comments pertaining to Regulation ER–946 adopted February 27, 1976, the C.A.B. indicated that carriers were not to avoid liability by means of entering into contractual agreements whereby air taxis would fly passengers over scheduled routes. It stated:

> [S]uffice it to say that a fundamental principle of our approach to the subcontracting arrangements is that the certificated carrier retains full primary responsibility for serving its route and we insist that, despite existence of a subcontract, the continuing responsibility of the certificated carrier must be reflected in its principal/agent relationship with the subcontractor.[13]

Finally, we note that a somewhat similar argument was advanced in *Northwest Air-*

---

fornia cases involving trucking franchises that merits some comment. In *Eli v. Murphy*, 39 Cal.2d 598, 248 P.2d 756, 757 (1952), Justice Traynor stated that where an independent contractor is working for a common carrier which is licensed and regulated by the state, the common carrier has a non-delegable duty. Justice Traynor was careful to distinguish the situation of *Gaskill v. Calaveras Cement Co.*, 102 Cal. App.2d 120, 226 P.2d 633 (1951), where the independent contractor held its own license and was lawfully permitted to ship without reliance on the common carrier's license. The *Gaskill* case defines what might be termed the "equal footing" doctrine which creates a possible exception to § 428 where both the general contractor and the independent contractor may lawfully operate under their own individually-held licenses. The "equal footing" doctrine, while recognized by Justice Traynor in *Eli v. Murphy, supra*, as a somewhat confusing history of application in California. In *Lehman v. Robertson Truck-a-Way*, 122 Cal.App.2d 82, 264 P.2d 653, 655–56 (1953), the California Court of Appeal found the equal footing doctrine to be "ingenious but unconvincing." The California Court of Appeals in *Gilbert v. Rogers*, 117 Cal.App.2d 712, 256 P.2d 574, 577 (1953), felt obliged to apply the "equal footing" doctrine but disagreed with the rule. We need not make a specific holding as to the validity of the "equal footing" doctrine as an exception to § 428 since, in any event, we hold it inapplicable to the facts of this case. While Chitina did hold a state license to fly charter routes, it did not hold an independent license to fly scheduled routes under the federal franchise. Chitina's ability to make the flight in question was dependent on Alaska Airlines' license. The parties cannot be considered to be on "equal footing" with respect to the licenses they held. Generally, however, we do not find the arguments for the "equal footing" doctrine persuasive, for passengers should be able to look to the carrier with which they contract.

**13.** Alaska contends that ER–946 was improperly considered by the trial court as it was first submitted to the court at the hearing on the summary judgment motions. Alaska Airlines, however, did not object to its admission. No motion for reconsideration was filed, and Alaska Airlines' motion for continuance was made to another judge after Judge Buckalew's written decision was filed. That decision did not

lines v. Alaska Airlines, Inc., 351 F.2d 253, 256–57 (9th Cir. 1965), cert. denied, 383 U.S. 936, 86 S.Ct. 1068, 15 L.Ed.2d 853 (1966). The C.A.B. had approved a schedule of charges for Alaska's use of the Shemya Airport and an indemnity agreement between Alaska and Northwest. An earlier case had held under Alaska law that an exculpatory clause in an airport use agreement was violative of public policy as applied to damage caused by the operator's negligence. It was contended, however, that by virtue of the C.A.B. action, the entire management and operation of the airport was so effectively controlled by a pervasive regulatory scheme that the court was required to apply federal law to the issue of the validity of the indemnity provision. The Ninth Circuit failed to find federal pre-emption.[14]

We hold that there is no federal pre-emption preventing application of Alaskan law to the issues presented in this case.

depend on findings of economic and safety abilities of Chitina, and Alaska Airlines to this date has not indicated any other rebuttal evidence it could have introduced in response to the contents of ER–946.

14. For a recent case discussing pre-emption by federal law, see Jay A. Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

15. Cases holding that release of negligent parties at common law also releases vicarious parties are Seaboard Airline & Railroad Co. v. Coastal Distributing Co., 273 F.Supp. 340, 343 (D.S.C.1967); Honeycutt v. Town of Boyce, 327 So.2d 154, 161 (La.App.1976); Spradley v. McCrackin, 505 S.W.2d 955, 958 (Tex.Civ.App. 1974) (claiming to follow "the great weight of authority"); Gramm v. Armour & Co., 132 Ill. App.2d 1011, 271 N.E.2d 52, 54 (1971); Reese v. Credit, 12 Ariz.App. 233, 469 P.2d 467, 471–72 (1970) (possibly reversed sub silencio); Dickey v. Estate of Meier, 188 Neb. 420, 197 N.W.2d 385 (1972) (release of employee releases employer even though reserving claims against employer); Land v. United States, 231 F.Supp. 883, 884 (N.D.Okl.1964); Barsh v. Mullins, 338 P.2d 845, 848, 851 (Okl.1959); Downer v. Southern Union Gas Co., 53 N.M. 354, 208 P.2d 815, 817 (1949); Johns v. Hake, 15 Wash.2d 651, 131 P.2d 933, 934 (1942); see Casper National Bank v. Jones, 79 Wyo. 38, 329 P.2d 1077, 1081 (1958).

## IV. DISMISSAL OF CHITINA

The Sweats entered into a contract not to sue Chitina in consideration of payment of $118,500.00 and stipulated to Chitina's dismissal from suit. Both the covenant not to sue and the dismissal specifically stated that the settlement did not include a release of Alaska Airlines. Alaska Airlines contends, however, that it cannot be held vicariously liable for Chitina's negligence after Chitina's release.

There is a substantial line of cases at common law upholding Alaska's position,[15] but a number of recent cases have concluded that release of the negligent party does not preclude suit against the party whose liability is vicarious.[16]

While we have not addressed this specific question, we previously rejected the harsh common law rule whereby the release of one joint tort-feasor acted as a release of all. In Young v. State, 455 P.2d 889, 893 (Alaska 1969), we stated:

16. The following are cases which hold that release of the agent does not release the master at common law where: (1) the document expressly so provides, or (2) the document is entitled "covenant not to sue" (as opposed to a "release") or (3) the intent of the parties otherwise indicates no intent to release the master or principal; Hovatter v. Shell Oil Co., 111 Ariz. 325, 529 P.2d 224, 226 (Ariz.1974); Holcomb v. Flavin, 62 Ill.App.2d 245, 210 N.E.2d 565, 567 (1965); Henry B. Steeg & Associates v. Rynearson, 143 Ind.App. 567, 241 N.E.2d 888, 889–90 (1968).

The State of Michigan appears to hold that release of a servant does not release a master—Boucher v. Thomsen, 328 Mich. 312, 43 N.W.2d 866, 870 (1950); Centala v. Navrude, 43 Mich.App. 282, 206 N.W.2d 544, 547 (1973) —although where the document was called a "release," the decisions go the other way. Cf. Witucke v. Presque Isle Bank, 68 Mich.App. 599, 243 N.W.2d 907, 912 (1976).

Cases in the jurisdiction of Arizona may be in conflict. Hovatter, supra, decided in 1974 by that supreme court, permits suit against a master following a settlement with the servant by covenant not to sue in a situation of vicarious liability. The case of Reese v. Cradit, 12 Ariz. App. 233, 469 P.2d 467 (1970), a Court of Appeals case, appears to go the other way. The more recent supreme court case does not mention Reese v. Cradit but appears effectively to overrule it.

a release of one tort-feasor does not release another joint tort-feasor unless such tort-feasors are specifically named in the release. We are of the further view that adoption of this rule will insure that the intent of the parties to the release is given effect and will greatly minimize the possibility of any party being misled as to the effect of the release.[17]

*Young v. State, supra,* however, involved two joint tort-feasors who were independently negligent—a driver for negligent driving and the state for negligent road maintenance. In this case, the trial court's holding and Sweat's claim against Alaska Airlines is based solely on the doctrine of vicarious liability. There is no claim that Alaska Airlines was independently negligent.

■■■ The rationale of the *Young* case, however, appears equally applicable to situations involving vicarious liability. This conclusion is bolstered by consideration of the Alaska Uniform Joint Tortfeasors Act, AS 09.16.010 *et seq.* which was passed after the decision in *Young.* AS 09.16.040(1) states:

> *Release or covenant not to sue.* When a release or covenant not to sue or not to enforce judgment is given in good faith *to one of two or more persons liable in tort for the same injury or the same wrongful death*
>
> (1) *it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide*; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; . . . . (emphasis added)

17. The *Young* case was cited with approval in Prosser Law of Torts, Ch. 8, § 50 p. 304 (4th ed. 1971), which states: "The requirement that an express reservation of rights against other tort-feasors be inserted on the release itself seems unfortunate. . . . ."

18. *Kemp v. Barnett,* 132 Cal.Rptr. 823, 825–26 (Cal.App.1976); *Holve v. Draper,* 95 Idaho 193, 505 P.2d 1265, 1266 (1973); *Ritter v. Technicolor Corp.,* 27 Cal.App.3d 152, 103 Cal.Rptr. 686, 687 (1972); *Smith v. Raparot,* 101 R.I. 565, 225 A.2d 666, 667 (1967). At least one case inter-

■■■ The question under this statute is whether a vicariously liable party is covered by the quoted language. The language "one of two or more persons liable in tort for the same *injury* . . ." (emphasis added) seems to include a party who is vicariously liable. Alaska Airlines is liable in tort for the same injury as Chitina, even though Alaska is not technically a "tort-feasor."

A number of jurisdictions have considered the effect of the Uniform Joint Tortfeasors Act on the common law rule pertaining to releases in the vicarious liability situation. California, Rhode Island and Idaho have held that their statutes overruled the common law previously applicable in those states.[18] Illustrative of these cases is *Smith v. Raparot,* 101 R.I. 565, 225 A.2d 666, 667 (1967), which we find particularly persuasive. There the court stated:

> The solution of this case, however, does not lie in the selection of one of the conflicting views as preferable but in whether master and servant are deemed to be joint tort-feasors within the purview of the Uniform Contribution Among Tort-Feasors Act, G.L.1956 Chapter 6 of Title 10, hereinafter referred to as "the act". It defines the term "joint tort-feasors" in section 10–6–2 as follows:
>
> > "For *the purposes of this chapter the term* 'joint tort-feasors' *means two or more persons jointly or severally liable in tort for the same injury to person or property whether or not judgment has been recovered against all or some of them.*"
>
> That language is plain and unambiguous. It declares its own sensible meaning and

preting the Uniform Act is to the contrary. *Craven v. Lawson,* 534 S.W.2d 653 (Tenn. 1976). Also, New Jersey's statute specifically varies its language from Alaska's stating: "A master and servant or principal and agent shall be considered a single tortfeasor." N.J.Stat. Ann. § 2A:53A–1. Counsel for the Sweats brings the *Craven* case to the court's attention in spite of the fact that it was an adverse authority. They are to be commended for doing so.

leaves no room for judicial construction. (emphasis in original)

While Alaska's Act does not have a definition of the term "joint tortfeasors" as such, it nevertheless clearly uses the term in the same context as the Rhode Island statute. The opening section of the Alaskan Act states:

> *Right to contribution.* (a) Except as otherwise provided in this chapter, *where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death*, there is a right of contribution among them even though judgment has not been recovered against all or any of them. (emphasis added) [19]

Thus, we conclude that AS 09.16.040 is intended to include those vicariously liable. It may be that Alaska Airlines is not technically a "tort-feasor," but it is "one of two or more liable in tort for the same injury."

█ In any event, based on our reasoning in *Young*, we would reach the same result at common law by giving effect to the obvious intent of the parties to the covenant. The policy favoring termination of litigation and encouraging settlement agreements should here prevail.

█ We hold that the covenant not to sue Chitina did not have the effect of releasing Alaska Airlines from vicarious liability. Judge Buckalew did not err in denying Alaska Airlines' supplemental motion for summary judgment based on that covenant.

## V. ALLEGED FACTUAL ISSUES

█ Alaska contends that the summary judgment was improperly granted because factual issues existed.[20] In its statement of genuine issues, Alaska Airlines claims that a factual issue existed as to whether Sweat "was a passenger of Alaska at the time of the crash." Alaska has failed to point out any document indicating a material dispute on this issue. Based on the evidence presented below, the court did not err in concluding that there was no factual issue as to Sweat being a passenger of Alaska Airlines.

█ The second alleged factual issue pertains to Chitina's qualifications to operate the route and to its financial responsibilities. As previously indicated in this opinion, facts pertaining to those matters were not material in Judge Buckalew's decision imposing vicarious liability. We therefore find no merit in Alaska's contention that existence of factual issues made summary judgment inappropriate.

## VI. LIMITING CROSS-EXAMINATION

After partial summary judgment was granted on the issue of whether Alaska could be held vicariously liable, the case went to trial on the questions of negligence and damages. George Heliker, an economist, testified as an expert witness for the Sweats. Dr. Heliker based his testimony on lost future earnings and pension benefits on our decision in *Beaulieu v. Elliott*, 434 P.2d 665 (Alaska 1967). He did not reduce those damages to present value, even though had Mr. Sweat not been injured, the Sweats would not have had the present use of the money. Applying the *Beaulieu* reasoning, Dr. Heliker balanced such reduction against the effects of inflation.

---

**19.** AS 09.16.010(a). Here, Alaska would have a right to indemnity rather than contribution as AS 09.16.010(f) specifies:

> This chapter does not impair any right or indemnity under existing law. If one tortfeasor is entitled to indemnity from another, the right of the indemnity obligee is for indemnity and not contribution, and the indemnity obligor is not entitled to contribution from the obligee for any portion of his indemnity obligation.

Contrary to the views expressed in the concurrence filed herein, I believe that Alaska's act is expressly intended to cover situations involving vicarious liability which is one reason for inclusion of subsection (f).

**20.** A summary judgment may not be granted when there are genuine issues of material fact to be resolved. Civil Rule 56(c). *See Howarth v. First National Bank of Anchorage*, 540 P.2d 486, 489–90 (Alaska 1975); *Brock v. Rogers and Babler Co.*, 536 P.2d 778, 782–83 (Alaska 1975); *Alaska Rent-A-Car v. Ford Motor Co.*, 526 P.2d 1136, 1138 (Alaska 1974); *Braund, Inc. v. White*, 486 P.2d 50, 53–54 (Alaska 1971).

On cross-examination, counsel for Alaska began to question the applicability of the *Beaulieu* case. Objection was made to that line of cross-examination based on the contention that *Beaulieu v. Elliott* settled the issue. The trial court sustained the objection limiting the cross-examination as outside the scope of the direct examination, and stated that if counsel wanted to disprove *Beaulieu,* he could do so with his own witnesses during his own case.[21] Alaska claims that this limitation on cross-examination was error.

 In an offer of proof, Alaska Airlines indicated its intent to show that *Beaulieu v. Elliott* was inapplicable to the facts of this case. Since Sweats' expert economist testified that he had followed *Beaulieu* in calculating damages, the trial court was incorrect in stating that the cross-examination was "beyond the scope of direct examination." Civil Rule 43(g)(7) states:

> *Cross Examination.* An adverse party may cross examine a witness as to any matter stated in the direct examination *or connected therewith,* . . . (emphasis added)

**21.** The exchange occurred as follows:

THE COURT: Okay. I know where you want to go, Mr. Hagans, but the court's ruling is going to be that as of right now you're going to be limited to what was covered on direct and covering what has to do with evidence of this case. If you want to prove Beaulieu versus Elliott was wrong you do it with your own expert and your own money. So sustained.

MR. HAGANS: I don't understand the court's remark about my own money.

THE COURT: I'm talking about the facts of life that experts are paid by the day and Mr. Heliker presumably is being paid by the plaintiff and you're certainly entitled to cross examine on anything that is relevant as to this particular lawsuit and as to this particular plaintiff and anything in these particular figures. However, I'm going to sustain the objection with regard to questions on the attack of Beaulieu generally as the law of the land unless you wish to do it with your own expert as part of your own case.

MR. HAGANS: Well, I'd like to make an offer of proof at this time and I'd like to offer to show that—through this witness that it's possible to purchase government backed securities in the form of mortgages, say from

 Certainly, the "applicability of *Beaulieu* to the facts of this case" was "connected" to the direct examination. Furthermore, it is generally recognized that cross-examination is a basic right and should be given considerable leeway.

 On the other hand, the trial court is not compelled to permit cross-examination on "irrelevant questions," even if within the scope of direct examination. It could be argued that any error would be "harmless error" if, assuming Alaska's offer of proof was true, *Beaulieu* would still apply as a matter of law. However, since we find that *Beaulieu* is or may be inapplicable to certain of the damages in this case, a remand is necessary to permit cross-examination of the witness or, alternatively, to permit Alaska the opportunity to present evidence on this issue.

## VII. FAILURE TO PERMIT WITNESSES TO TESTIFY

The trial court refused to permit Alaska Airlines to call two witnesses who were not listed on Alaska's witness list. Prior to

what's called the government national mortgage association that will—that would guarantee monthly incomes equivalent to the losses that have been demonstrated here for a period of say, 12 years to the time when Mr. Sweat might be expected to be earning considerably more than he's earning now for something on the order of $150,000.00 at the rate that is being paid on those securities which is, I would offer to prove, is in the area of 8—better than 8 percent. And that this kind of thing reflects realistic economic thinking rather than some statistical approach that has no real validity in the affairs of men. It's not an attack on Beaulieu for the very reason that I've stated and that is that in this case the man has not lost all of his earning power and his proportionate increase or decrease in wages should stay the same is the point I'm making . . .

 . . . . .

THE COURT: The objection will be sustained. Mr. Hagans, I have no objection to you going into any sort of economic theory to demonstrate other possible areas that might work as part of your own case with any expert you wish or with this expert, if you wish to do so if you can make arrangements.

trial, each party was required to list the witnesses it intended to call.[22]

One witness precluded from testifying was Ernest Gillam. Allegedly, Gillam would have rebutted Sweat's statement that he thought Chitina was part of Alaska Airlines by testifying that Sweat had chartered directly with Chitina in the past. Whether a rebuttal witness should be included on a pre-trial witness list in the absence of specific provision in the pre-trial order,[23] should be dependent on whether the testimony sought to be rebutted could reasonably have been anticipated prior to trial. Sweat's deposition was taken long prior to trial, but he was not asked whether he believed Chitina to be part of Alaska Airlines. Therefore, it is questionable whether Sweat's testimony at trial could have been anticipated. The testimony sought to be elicited, however, would at best involve impeachment on a collateral issue.[24] The trial court did not abuse its discretion in excluding the witness.

The second witness precluded from testifying was Alaska's economic expert, Engleman. He was called as a witness on the last day of trial, and his name was not on the witness list. Alaska contends that it could not have anticipated that its cross-examination of Sweat's expert would be so restricted that it would be required to call its own witness. Nevertheless, when the court indicated to Alaska that it would permit expert testimony, Alaska, if it intended to avail itself of that opportunity, should have advised counsel for the Sweats of his identity. Certainly, Mr. Engleman should have been identified at a conference the previous afternoon when Alaska indicated the witnesses it would call to wind up the trial. By that time, Alaska had ample notice of the need to rebut Dr. Heliker's testimony.[25] In reliance on Alaska's final failure to advise that it intended to call an expert economist, counsel for the Sweats released Dr. Heliker to return to his home in Montana, and Heliker had left Alaska when the Engleman testimony was offered. Under these circumstances, it was not an abuse of discretion for the trial court to refuse to permit Mr. Engleman to testify.

## VIII. THE RIGHT TO CHALLENGE THE AWARD OF DAMAGES

Sweat claims that Alaska has waived all rights to challenge damages since it filed neither objections to the findings of fact and conclusions of law nor a motion for new trial. Sweat cites *City of Fairbanks v. Smith*, 525 P.2d 1095 (Alaska 1974). In that case, the jury assessed damages and the defendant appealed claiming excessive damages. We held that the damages were not excessive. We stated, however, that the issue of excessiveness is initially within the discretion of the trial court, and ruled prospectively that if a party fails to raise the claim to the trial court via motion for new trial, this court would *not* review damage awards. *Smith, supra* at 1097. The question here is whether *Smith* applies to a nonjury situation. In a judge-tried case, the trial court exercises its discretion by awarding damages. The trial court has not had an opportunity to reconsider its decision, but *Smith* did not address the subject of reconsideration. Additionally, all of Alaska's claims go to whether or not the trial court erred as a matter of *law* in its manner of calculating damages. *Smith,* on the other hand, goes to questions of *fact,* i. e., excessiveness of the amount awarded. As indicated in *Smith,* questions

---

**22.** *See United States v. Hayes,* 369 F.2d 671, 674 (9th Cir. 1966).

**23.** While the pre-trial witness list is available for our review, the pre-trial order was not designated as a part of the record on appeal.

**24.** *See* our discussion of the vicarious liability issue. The decision is not dependent on whether Mr. Sweat thought that Chitina was a separate airline or a part of Alaska Airlines.

**25.** Alaska Airlines had notice that Heliker would testify from the witness list filed with the court on January 24, 1976. Also, Heliker's conclusions showing his methods of calculation were supplied to Alaska in an attachment to Sweats' opposition to Alaska's supplemental motion for summary judgment which was filed on March 3, 1976.

of fact involve initial "trial court discretion." Questions of law do not. Examination of the cases cited in *Smith* shows that where review was denied because of failure to file a motion for new trial, the issue involved *factual* questions of excessiveness following *jury* verdicts.

▮▮▮ We hold that in a court-tried case, it is unnecessary to file objections to the findings of fact and conclusions of law or to file a motion for new trial in order to raise on appeal legal issues as to damages.

## IX. AWARD OF FUTURE RETIREMENT BENEFITS

The trial court awarded $324,508.00 in lost retirement benefits and then deducted $50,000.00 in retirement benefits to be gained from alternative employment, leaving $274,508.00 in lost pension benefits.[26]

As a member of the International Brotherhood of Electrical Workers, Mr. Sweat was entitled to receive two annuities upon attaining retirement age. The evidence indicated that but for his injuries, Sweat would have worked the requisite number of hours and years to earn these annuities. The annuities to be received, however, far exceed the amount of the employers' contributions. The funds contributed by employers are administered by a special trust and invested in mortgages and stocks. Sweat would have been eligible for retirement 30.7 years from the date of trial. Due to investment, the amount contributed to the pension fund would increase in value over the years, and the total amount of annuities Sweat anticipated to receive at the end of the 30.7 years was enhanced by those investment earnings. Thus, by the court's award of damages, not only did Sweat get the present use of funds that otherwise would have been contributed over many years, but he also received an increase attributable to the earnings from investment of those funds over 30.7 years.

In *Beaulieu v. Elliott, supra* at 670–72, we discussed the effect of receiving a lump sum award for future loss of earnings. We stated that because money has the power to earn money, it has become the generally-accepted rule that damages awarded for future loss of earnings should be reduced to present worth. We observed, however, that inflation at varying rates has been with us for many years, and that "[t]his rate of depreciation offsets the interest that could be earned on government bonds and many other safe investments." We also stated that wages would be likely to increase over the years and that that increase is not normally calculated in loss of future earnings.[27] For these reasons, we held that it was unnecessary to reduce the lump sum award for future lost earnings to present value. While the first reason may be of questionable validity, the constantly increasing wage factor still justifies the *Beaulieu* result.

In Sweat's case, however, an equivalent of the inflationary factor has already been included by adding the anticipated earnings of the contributions for pension benefits over the 30.7 years to the amount of the contributions. True, after 30.7 years, Sweat would have been entitled to the increased sum, but he would not also have been able to invest it over that period of time. Thus, the computation allowed by the court, in effect, gives Sweat a double recovery.

▮▮▮ The amount awarded was based on the difference in pension benefits that Mr. Sweat would have received had he continued his employment as an electrician and the reduced benefits he would receive as a draftsman. These latter benefits were computed in the same manner as the former. Accordingly, it will be necessary to reduce both figures to the present cash value of the sums that "would otherwise be received 30.7 years in the future." In the alternative, based on the *Beaulieu* assumptions regarding the effects of inflation, the

26. The deduction of $50,000.00 forms the basis of one point in the Sweats' cross-appeal.

27. We construe the increase in wages referred to in *Beaulieu* as the normal increases attributable to inflationary factors. *See State v. Guinn,* 555 P.2d 530, 546 (Alaska 1976).

trial court may utilize the differences between the contributions which would be made over the 30.7 years under the electrician plans and those to be contributed under the plan applicable to draftsmen, without reduction to present value, but also without enhancement for increases due to investment.[28] Additional testimony may be received to the extent necessary to apply either formula.

## X. LOST FUTURE EARNINGS

The trial court awarded Mr. Sweat $337,317.00 for lost future earnings without a reduction to present value. The award was computed by deducting from the amount of earnings that he would have received by working until retirement as an electrician, the lesser sum that he could be anticipated to earn as a draftsman. The court considered that his earnings during his first five years employment as a draftsman would be at a lower rate than in subsequent years. Earnings as an electrician would have been $35,256.00 per year. The court found that annual earnings as a draftsman or designer would be $20,800.00 per year for the first five years and $24,960.00 for the next 25.7 years. By this method, the future loss of earnings was set by the court at $337,317.00.

Alaska contends that this sum should be reduced to its present value. In *Beaulieu,* we recognized that because of inflation, reduction of future wage loss to present value would not adequately compensate a plaintiff for actual loss. Inflationary factors

would be likely to increase the wages that would be earned in the future, and this inflationary rise would offset the present use of the funds.

Alaska argues, however, that *Beaulieu* is not applicable here because the computation of future wage loss is based on the gap between Sweat's earnings as an electrician and as a draftsman.[29] According to Alaska, that gap would remain constant, as both wage rates would increase over the years with inflation. Thus, the anual difference in the two wage rates would not be affected by inflation, and a failure to reduce the loss which otherwise would be received in the future to present value of earnings would, in effect, give Sweat a double recovery.

■ The difficulty with this argument is that it assumes that the lower wage would increase by the same cash value as the higher. It seems at least as likely that the two wages would increase by similar *percentages* over the years and that therefore the gap between the cash amounts of the two wages would increase.[30] Since we find it necessary to remand for further cross-examination of Alaska's expert and possible rebuttal, we believe that the trial court should accept testimony on this subject. The court should ascertain whether the gap would remain constant, in which event there would appear to be some validity to reducing the award to present value; or, in the alternative, whether the gap is likely to increase in the future so as to offset the advantage of having the present use of the funds.

**28.** While we agree with the concurrence that this formula does not involve the niceties of calculation with reference to the return which Mr. Sweat may be able to secure over the years on his cash award as compared with the net return anticipated from investments of the pension funds, it has an advantage of simplicity. As in *Beaulieu,* it avoids the sometimes complicated problem of reduction to present value. Damages in a case of this nature are always going to result in an approximation, and in this already highly technical area, any step towards simplicity seems meritorious.

**29.** *Beaulieu* also involved a situation where wage loss was measured by the difference between plaintiff's former wages and lower

wages which could be earned in a new job. However, we did not there directly consider the problem of the effect of inflation on the gap between those earnings.

**30.** For example, if an electrician had an annual wage of $30,000.00 and a draftsman $20,000.00, the initial difference would be $10,000.00. If each received a ten percent increase, the electrician's wage would be $33,000.00 ($30,000.00 plus ten percent of $30,000.00) while the draftsman would receive $22,000.00. The cash amount of the difference would thus increase by ten percent from $10,000.00 to $11,000.00. This additional $1,000.00 loss would still validly offset the benefit of cash in hand.

## XI. HEALTH, WELFARE AND LEGAL BENEFITS

The court awarded Douglas Sweat $1,000.00 for reasonable value of health, welfare and pre-paid legal benefits to which he would have been entitled had he continued employment as an electrician. Alaska argues that since he made no showing of loss due to the absence of such a plan between the date of his injury and trial, he was not entitled to that sum. Sweat did not replace the union's plan with one of his own.

The Sweats have cross-appealed contending that the court should have awarded the actual contributions that would have been made by his employers to the plan in the amount of $2,392.00 for health and welfare and $156.00 to the legal insurance fund.

■ If, during the five-year period, Sweat had been additionally injured and had incurred $50,000.00 in health and legal expenses that would have been payable under the plan, Alaska would have every right to contend that damages should be limited to the cost of securing coverage similar to that of the union plan. Although Sweat was not required to make expenditures for items covered by the union plan, he did lose the protection against those risks over the five-year period. There was no testimony to indicate that the value of the coverage would have been less than the actual amount contributed. In the absence of such testimony, we agree that the award should be increased to the amount of actual contributions that would have been made on Sweat's behalf over the period of time in question.

## XII. FUTURE HEALTH, WELFARE AND LEGAL BENEFITS

■ In their cross-appeal, the Sweats make similar contentions regarding future health, welfare and legal benefits. They claim that the trial court improperly awarded $10,000.00 as the difference in value between the benefits he would have received in the future under the IBEW union's plan and those available to him under alternate employment. The testimony indicated that Sweat's employer did maintain certain health and welfare programs for its draftsmen. There was little testimony, however, as to the value of benefits under these programs. It was shown that contributions to the IBEW union plans during Sweat's work life would have amounted to $44,117.00 for health and welfare and $9,454.00 for legal insurance. There was no showing that any legal insurance was available under the new job. In view of the evidence presented, it does not seem that the amount of $10,000.00 is adequate for this item. Upon remand, the court should take further evidence on this point and recompute this item of damages based on testimony pertaining to the difference in the reasonable value of the available coverages. In the alternative, the award could be based upon the differences in actual contributions that could be anticipated to have been made on behalf of Sweat under the different employment hypotheses. This latter method would be based on the assumption that the contributions would equal the value to be received by the employee. In either case, specific findings of fact should be made.

## XIII. ALLEGED DENIAL OF RIGHT TO A FAIR AND IMPARTIAL TRIAL

■ With the exception of allegations pertaining to the trial court's efforts to expedite the trial, Alaska's argument that the trial court's conduct denied it a fair and impartial trial is rather vague. We do not find that the trial court abused its discretion in its rulings on Alaska's various requests for continuances. Our review of the record fails to indicate that Alaska was denied a fair and impartial trial.

## XIV. DOUGLAS SWEAT'S POST–ACCIDENT EARNING CAPACITY

The trial court found Sweat's earning capacity after trial with his injuries would be $10.00 an hour for five years and then advance to $12.00 an hour up to the time of retirement.

Sweat claims both of these findings are unsupported in the record. First, he points to the fact that his supervisor testified that Sweat's earning capacity was $8.66 per hour at the time of trial, and his expert economist used this figure in his calculation of damages. Second, Sweat claims that the $2.00 increase from $10.00 to $12.00 per hour is not an automatic wage increase, is speculative and contrary to the dictates of *Beaulieu* and *Guinn.*

Alaska argues that future earning power cannot be fixed with mathematical precision and that the trial court's findings of fact are supported from inferences in the record and are not clearly erroneous.

The contested evidence on this point comes from Walter Steige, Sweat's supervisor following the accident. Sweat had worked as an electrical draftsman for six months, approximately one year prior to trial. Mr. Steige testified that in the six months that Sweat had worked as a designer, he had shown increased skill. He was initially paid $6.50 per hour but his wages had increased to $7.15 per hour. Steige testified as to Mr. Sweat's value at the time of trial as follows:

Q All right, and given the level of competence Doug [Sweat] had attained when he left Crews, MacInnes and assuming that level had remained constant until today's date, because of course, he hasn't been working until today's date, what would the prevailing wage for an electrical draftman of those skills and attainment be today?

A It would be approximately 18,000 on an annual basis.

The $18,000.00 per year was calculated to be $8.66 per hour.

Mr. Steige then testified that Mr. Sweat without further education would gain on-the-job training as a designer, and that his responsibilities and pay would increase with his ability. The top job for a designer, even without an engineering degree, would involve working alongside of the engineer with equal responsibility. Such a designer would make about $28,000.00 per year,[31] or approximately $13.46 per hour.

According to Steige, there was one such designer present in the engineering firm. This designer had been working in the firm for twelve years and had advanced to $28,000.00 after a time "considerably longer than six months." Mr. Steige stated that he believed that Sweat would reach this level within five to six years.

Based on this evidence, the trial court found that:

[Sweat] could currently earn 8.65 per hour . . . as an "average draftsman" . . . but that Sweat is a ". . . better than average designer" . . . and that ". . . Mr. Sweat's value as a designer at the present time is 10.00 per hour and that he would advance to at least 12.00 per hour in approximately 5 years upon his own capabilities for advancement. . . ."

The trial court thus used $10.00 per hour for the first five years and $12.00 an hour for the remaining employable years to calculate the balance of income Sweat would receive. This was then subtracted from lost earnings as an electrical lineman, calculated at $16.95 per hour, to attain the net lost income.

■ Sweats' first contention regarding the $10.00 an hour is well founded. No testimony mentions $10.00 per hour. Steige specifically stated Sweat was worth $8.66 per hour given his abilities when he left the firm. The trial court's ruling is therefore without factual basis. The damages for the first five years should be recomputed using $8.66 per hour.

■ As to the Sweats' second contention, there is competent testimony that as Mr. Sweat gained experience, his wages were likely to increase to $13.46 per hour after five or six years employment. Thus, there was adequate basis for the court's finding of earnings at $12.00 per hour after five years. This is not the inflationary type of increase referred to in *Beaulieu* that partially offsets the failure to reduce future

31. By division, this is roughly $13.46 per hour using the trial court's ruling of 2,080 working hours per year.

losses to present value. Rather, this is a reasonably predictable increase based on merit and is similar to the type of increase approved in *State v. Guinn, supra* at 546. It is true that in *Guinn*, we referred to automatic step increases that are keyed to length of service and which, by nature, are certain and predictable at time of trial. However, similar considerations apply to recreating the wages likely to be earned by a new employee. In this case, based on the employer's knowledge of Sweat's capabilities, it could be predicted with reasonable accuracy that after five years, he would be likely to earn at least $12.00 per hour calculated on the wage scale in existence at the time of trial. In *Guinn*, we stated:

> It is well known that there are almost annual wage increases in practically all Alaska employment categories. The common practice being that when union contracts are renegotiated, some increases are included. It is with reference to this type of increase that *Beaulieu's* remarks were addressed. Automatic step increases keyed to length of service are by their very nature certain and predictable at the time of trial, and they should be considered in a judicial estimation of

lost future earnings. The goal of the estimate is to ascertain as accurately as possible the lifetime earning prospects of the decedent at the time of his demise.[32] We expressly limit *Beaulieu's* reference to wage increases to those attributable primarily to inflation and hold it has no application to merit increases shown with reasonable certainty as likely to occur separate and apart from increases in the general wage level. Accordingly, we hold that the court did not err in utilizing the $12.00 per hour wage for Sweat after five years.[33]

## XV. ATTORNEY'S FEES

Mr. Sweat also contends that in awarding attorney's fees, the court erred in failing to set forth reasons for its departure from the schedule set forth in Civil Rule 82(a).[34] Based on the damages granted in favor of the Sweats, the fees under the rule would be $99,775.45. The amount awarded was $50,000.00. We have previously held that when the court departs from the schedule in awarding attorney's fees to successful plaintiffs, the reasons should be stated.[35] Here there may well be valid reasons for departing from the schedule, but they are not set forth. Since the case is

---

32. *Guinn, supra* at 546.

33. The author of this opinion agrees with that portion of the concurrence of Justice Erwin in *Guinn, supra* at 547–48, that indicates that the passage of time has made apparent the need for certain adjustments in the rules announced in *Beaulieu.* Specifically, I agree that the application of anticipated income taxes to future earnings should be re-examined in light of the experience with damage cases since *Beaulieu* was decided. The issue, however, is not presented in this case and should not be addressed on remand.

34. Civil Rule 82(a) specifies:

(a) *Allowance to Prevailing Party as Costs.*
(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

(2) In actions where the money judgment is not an accurate criteria for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

(3) The allowance of attorney's fees by the court in conformance with the foregoing schedule is not to be construed as fixing the fees between attorney and client.

35. *Fairbanks Builders, Inc., et al. v. Sandstrom Plumbing and Heating, Inc.*, 555 P.2d 964, 966 (Alaska 1976); *Kenai Power Corp. v. Strandberg*, 415 P.2d 659, 661 (Alaska 1966); *Patrick v. Sedwick*, 413 P.2d 169, 179 (Alaska 1966).

being remanded in any event, the trial court should re-examine the award of attorney's fees and set forth reasons for departure, if any, from the schedule of Rule 82(a).

## XVI. CONCLUSION

In view of the multitude of issues involved, we shall summarize our holdings.

1. The trial court did not err in finding that Alaska Airlines was vicariously liable for the negligence of Chitina.

2. The covenant not to sue Chitina did not release Alaska Airlines from liability.

3. The federal regulatory scheme pertaining to aviation does not pre-empt the application of Alaska law to the issues presented in this case.

4. There were no genuine issues of fact so as to prevent the award of partial summary judgment with reference to Alaska Airline's liability.

5. The admission and consideration of ER–946, without objection, did not constitute error.

6. Cross-examination of the Sweats' expert witness on damages was improperly curtailed and constitutes error requiring a remand.

Upon remand, Alaska Airlines shall be permitted to cross-examine Dr. Heliker as to his application of the principles of *Beaulieu*. To the extent that new testimony is introduced, Alaska Airlines may present answering testimony. If Dr. Heliker is unavailable for any reason, Alaska Airlines shall be permitted to introduce testimony of its own expert witness with reference to the application of *Beaulieu* principles, and the Sweats may call a witness in rebuttal. The trial court is free to exercise its discretion in permitting further testimony for the limited purposes of this remand.

7. It was not an abuse of the trial court's discretion to exclude the testimony of two Alaska Airlines' witnesses who were not listed on witness lists.

8. Alaska was not denied a fair and impartial trial.

9. The amount of lost health, welfare and legal benefits to date of trial should be increased from $1,000.00 to $2,251.00.

10. The court erred in its computation of future retirement benefits. Future loss of such benefits should be based on the difference in the amount of contributions to the respective funds that would have been received under the IBEW union plans from the amount of contributions that will probably be made by Sweat's new employers, or on the basis of the difference in premiums necessary to fund the respective plans.

11. The court erred in finding that Sweat's post-trial earnings would be at the rate of $10.00 per hour for five years rather than $8.66 per hour.

12. The court did not err in finding that the earnings would increase to $12.00 per hour after five years.

13. The court upon remand should reassess attorney's fees and, in the event of any variance, set forth its reason for departing from the schedule set forth in Civil Rule 82(a).

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

ERWIN, J., not participating.

RABINOWITZ, Justice, with whom BURKE, Justice, joins, concurring.

Although I am in agreement with the court's treatment and disposition of most of the issues in this appeal, I find I cannot agree with two aspects of the court's opinion.

In part IV of the opinion, the court holds the rule that the release of a negligent party releases all who are vicariously liable will not be applied in Alaska. While I concur in this result, I disagree with the reasoning employed by the court. The majority undertakes an examination of the language of the Uniform Contribution Among Joint Tortfeasors Act, AS 09.16.010 —.060, and determines that the release situ-

ation in the case at bar is covered by that act. The suggestion that the Act is applicable to parties vicariously liable rather than solely to joint tortfeasors is one in which I cannot join. The concept of "contribution," the focal point of the Act, is not applicable to vicarious liability situations. In vicarious liability matters, where one party is held liable for another's negligence although personally innocent, the appropriate concept is indemnity.[1] Indemnity shifts the entire burden of liability; contribution, as recognized in AS 09.16.010(b), provides for a pro rata distribution of damages among the negligent parties. In my opinion, AS 09.-16.010(f)[2] illustrates the intent of the legislature to avoid application of the Act to situations involving vicarious liability and the concomitant concept of indemnity. However, in my opinion, the rationale employed in *Young v. State*, 455 P.2d 889 (Alaska 1969), is also applicable to instances involving vicarious liability and, thus, I concur in the result reached by the majority regarding the release issue.

The second area of disagreement concerns the alternate method of computing the award of future retirement benefits advocated by the majority. The suggestion is made that the trial court might use the difference between the contributions made over the 30.7 years under the electrician plan and under the draftsmen plan, without reduction to present value, but also without enhancement for increases due to investment. In my view, this formulation ignores some basic differences between individual investment and institutional investment. Normally the small investor is not able to produce the same return on his investment dollar as the institutional investor. The small individual investor is faced with higher brokerage fees and investment advisor fees. If the small investor wants to diversify in order to maximize profit while minimizing risk, he must often purchase the

shares of investment companies or mutual funds, most of which include a significant amount for "load,"[3] thus decreasing the percentage return on the investment dollar. The goal of compensatory damages for personal injuries is to attempt to make the injured party whole. Since the party with a lump sum representing the difference between amounts contributed to the pension plans could not invest that money as effectively as the pension plan, the party would not be made whole by such a measure of damages. Thus, I would hold that the appropriate measure of damages is the difference between the amount of pension benefits that Sweat would have received under the electrician plan and the amount of benefits that he will receive under the draftsmen plan, reduced to present value.

---

1. *See* W. Prosser, Law of Torts § 51, at 310 (4th ed. 1971).

2. See note 19 for the text of AS 09.16.010(f).

3. The term "load" refers to the additional charge on the securities of investment companies over and above the pro rata share of the underlying securities. The amount includes fees for investment advice and management of the investment company.