**CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, Plaintiff,**

v.

**Jose F. SISNEROS, Maclovio Rivera, et al., Defendants.**

**Civ. No. 4058.**

United States District Court
D. New Mexico.

June 19, 1959.

William W. Gilbert and Edwin E. Piper, Jr., of Gilbert, White & Gilbert, Santa Fe, N. M., for plaintiff.

P. R. Melendez, of Chacon & Melendez, Espanola, N. M., and David Chavez, Jr., Santa Fe, N. M., for defendants.

KERR, District Judge (assigned).

This is an action for declaratory judgment brought under the provisions of Title 28, Section 2201, U.S.C.A. The plaintiff is a Nebraska corporation. The defendants are citizens of the states of New Mexico and Colorado and the amount in controversy, exclusive of interest and costs, exceeds the sum of ten thousand dollars.

On July 25, 1958, the Central National Insurance Company, hereinafter referred to as "Insurer" issued an automobile liability insurance policy to defendant Jose F. Sisneros, effective July 25, 1958, for a period of two years. The insured vehicle was described as a 1951 Ford ¾ ton truck.

On August 2, 1958, while the policy was in force, Sisneros was driving a 1957 Ford automobile owned by Lea G. Duran and was involved in a serious accident resulting in death to some and serious injuries to other persons. One action has been instituted against Sisneros in a New Mexico state court with a possibility of other actions to follow.

The Insurer has denied liability under the policy. The purpose of this suit is to determine whether the Insurer is legally obligated under the terms of the policy to defend the damage suit now pending, and others where and when brought, and to pay any judgment which may be obtained against Sisneros within the limits of the policy.

The insuring agreement IV(3) of the policy is as follows:

"Temporary Substitute Automobile.—an automobile not owned by the named insured or his spouse if a resident of the same household, while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its *breakdown*, repair, servicing, loss or destruction;" (Emphasis supplied.)

In order to determine whether Sisneros was covered by the provisions of Agreement IV(3) in respect to a temporary substitute automobile it is necessary to set out the circumstances which led him to make use of Mrs. Duran's car on the date of the accident.

Sisneros was called as an adverse witness and testified that he was acquainted with Mrs. Duran and that he had known her for about fifteen years; that his wife and Mrs. Duran's husband are sister and brother; that at times he has done some work for Mrs. Duran on her farm; that approximately three weeks before the accident he was working at a saw mill twelve miles from Fort Garland, Colorado; that he had been the owner of the Ford pickup for five or six years and that he purchased it second hand; that it was in good working condition when he purchased it; that he had the truck with him when working at the saw mill and that it was not running very good at the time; that he used the truck to go to and from work while working at the mill; that he quit his job at the mill during the last of July and drove to Alamosa, Colorado; that he met a man in Alamosa, who asked him what he was doing and he stated he was looking for a job and Sisneros was advised that a truck driver was needed at the Pearlite mine near No Agua, New Mexico; this conversation took place the last week of July:

"Q. After talking to him, where did you go? A. I rode around about one or two streets there and I was on the way to Antonito and finally the pickup stopped.

"Q. Why did you want to go Antonito, Mr. Sisneros? A. Because it was near for me to go to work up there.

"Q. All right, now you said you started out of Alamosa to go to Antonito, what happened? A. My truck stopped and I couldn't start it.

"Q. Why did it stop? Did you bring it to a stop? A. No, it won't work.

"Q. Was that on Main Street? A. No, it wasn't on Main Street.

"Q. Was it on a side street? A. On a side street.

"Q. Why did it stop, do you know? A. Well, it stopped there and I couldn't start it again.

"Q. You say it had been missing up at Fort Garland? A. Yes.

"Q. Now you say that you were just driving along the street and all of a sudden it quit? A. Yes, sir.

"Q. Where did you put it? A. Put it in the street.

"Q. How did you put it there? A. I just pushed it. I put it in gear and I pressed the starter button and it rolled down to where I parked it.

"Q. Your car stopped and you parked it there in the parking place on the street. Then what did you do? A. Well, that thing what I was going to do and I found that job, and I learned that the woman lived there, the lady, and I went up there to see if I could borrow her car.

"Q. What did you say to her? A. I told her that if I could have her car to go to work and back for a week.

"Q. What did she say? A. She said it was all right.

"Q. What kind of car does she have? A. A 1957 Ford.

"Q. And then what did you do that day when she said you could borrow her car? A. And I asked her to board me for a week until I got my truck fixed."
The evidence discloses that Sisneros drove the 1957 Ford commencing on Monday through Saturday of the same week. That the mine where he was employed was approximately forty miles from Alamosa.

The above evidence stands uncontradicted except as to two or three answers which were given by Sisneros to the Insurance Adjustor, which will be referred to later. Mrs. Duran testified that she was a school teacher by profession and related to Sisneros by marriage.

"Q. Will you proceed and tell the court just exactly what happened when you saw Mr. Sisneros, who came there to your place the latter part of July, 1958, when you say that you and your two children were living there and you were attending this Adams State Teachers College? A. I don't remember if it was on Sunday, he came and asked me if he could use my car for a week and I said it was all right. He said he would fix his pickup.

"Q. Did he tell you why he wanted to borrow your car? A. He said his pickup wasn't running.

"Q. Now, did he say anything to you with reference to boarding him or staying there at the place? A. Yes, he asked me if I would board him. He thought he would fix his pickup within a week and asked me to board him for a week.

"Q. Did he tell you where he was going to work, where he had gotten a job? A. Yes.

"Q. What did he say? A. He told me he had gotten a job at the pearlite somewhere near the Tres Piedras, somewhere in there.

"Q. And about what time would he leave in the morning, the best you can recall? A. I don't know exactly, maybe around five or six, I don't know."

On August 18, 1958, approximately two weeks following the accident, an Insurance Adjustor for the Insurer took Sisneros before a notary public, placed him under oath and interrogated him with respect to the circumstances by which he had borrowed the car.

The following questions were asked and answers given:

"Q. Well, now, were you staying at the same address as Leah Duran? A. Yes, sir.

"Q. For how long? A. Oh, I had been staying there for maybe a year. You mean here in Alamosa?

"Q. Well, all together, Alamosa and Antonito. A. Yes, about a year.

"Q. At the same address? A. Yes.

"Q. Now you had her permission to use this 1957 Ford automobile which she owned? A. Yes, sir.

"Q. Any time at your discretion? A. Yes, sir.

"Q. Now prior to the date of the accident, which is August the 2nd, is it correct you had been driving this car daily for a period of one week? A. Yes, sir.

"Q. And prior to that time, for approximately a year, as I said, at your discretion? A. Yes, sir."

It will be observed that Mrs. Duran was a teacher in Dulce, New Mexico, and did not come to Alamosa until June 1958 to attend summer school. She further testified that Sisneros had driven her car approximately twice during the previous year. Obviously the questions and answers given in Sisneros' statement were inconsistent with other established facts. The Court observed that Sisneros has a very poor understanding of the English language and an interpreter was used in the trial of this case and was called upon several times to interpret the questions into Spanish before he understood their meaning. Since no interpreter was present or used at the time the statement was taken from Sisneros I have grave doubts as to whether or not he had a full and complete understanding of the meaning of the questions propounded. He testified with respect to the word "discretion" that he did not know what it meant. I have therefore given little weight to the questions and answers given by him on August 18, 1958.

▪ To establish coverage under the Agreement IV(3) of the policy there must be a temporary use by the insured of an automobile not owned by him in place of the truck described in the policy while it is "withdrawn from normal use because of its *breakdown*, repair, servicing, loss or destruction". Whether Sisneros' truck was so withdrawn from normal use at the time of the accident is a question of fact. All cases on the subject of "substitute automobile" sustain the doctrine fully that each case is determined by its own peculiar circumstances.

The purpose of the provision for coverage of a substituted vehicle is for the insured's benefit and it is to be construed liberally in favor of the insured, if any construction is necessary. The purpose of a substitution clause is not to narrow a limit or defeat coverage, but to make the coverage reasonably definite as to the vehicle the insured intended normally to use, while at the same time permitting him to continue driving should the particular vehicle named be temporarily out of commission, thus enabling the insurer to issue a policy upon a rate fair to both insured and insurer. See Allstate Insurance Company v. Roberts, 156 Cal.App.2d 755, 320 P.2d 90, and cases cited. 34 A.L.R.2d states at page 947:

"While an automobile owned in full or in part by the Named Insured is withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction, such insurance as is afforded by this Policy for bodily injury liability, for property damage liability and for medical payments with respect to such automobile applies with respect to another automobile not so owned while temporarily used as the substitute for such automobile."

To the same effect see 5A Am.Jur. 85, where it is stated:

"§ 87. 'Substitution' Provision. —The typical 'substitution' provision provides coverage while the substituted vehicle is being temporarily used, where the described automobile is withdrawn from normal use because of its breakdown, repair, servicing, loss, or destruction. The usual general rules of construction apply to such a provision, and it has been stated that the purpose of the provision is not to narrowly limit or defeat coverage, but to make the coverage reasonably definite as to the vehicles the insured intends normally to use, while at the same time permitting operations to go on should the particular vehicles named be temporarily out of commission, thus enabling the insurer to issue a

policy upon a rate fair to both insured and insurer, rather than one at a prohibitive premium for blanket coverage of any and all vehicles which the insured might own or operate.

\* \* \* \* \* \*

"Further requirements under a 'substitution' provision are that the use of the substitute vehicle be a temporary one, and that the automobile claimed to be covered be actually used as a 'substitute' for the described automobile."

The Insurer relies upon Aler v. Travelers Indemnity Co., D.C., 92 F.Supp. 620; Campbell v. Aetna Casualty & Surety Co., 4 Cir., 211 F.2d 732; Farm Bureau Mutual Auto Ins. Co. v. Marr, D.C., 128 F.Supp. 67; Harrill v. Motor Vehicle Cas. Co., D.C., 122 F.Supp. 389; Pennsylvania Threshermen & Farmers' Mutual Casualty Ins. Co. v. Robertson, 4 Cir., 259 F.2d 389; State Automobile Ins. Ass'n v. Kooiman, D.C., 143 F.Supp. 614; State Farm Mut. Auto. Ins. Co. v. James, 4 Cir., 80 F.2d 802; United States Fidelity & Guaranty Co. v. Grundeen, D.C., 138 F.Supp. 498; Western Casualty & Surety Co. v. Norman, 5 Cir., 197 F.2d 67, in support of the proposition that the Ford was not a substituted automobile. I have examined these cases with care and will not extend this memorandum by analyzing the facts in each of the above cases. Suffice it to say the facts in the case at bar are materially different from the facts and circumstances recited in these authorities.

Insurer urges that V(c) (1) of the policy is controlling. This section provides:

"to any automobile owned by or furnished for *regular use* to either the named insured or a member of the same household other than a private chauffeur or domestic servant of such named insured or spouse;" (Emphasis supplied.)

It contends the 1957 Ford was furnished Sisneros for regular use. I cannot agree. The evidence falls short of showing this vehicle was used by him more than two or three times during the previous year.

Neither am I impressed with the argument that Sisneros was a member of the Duran household. On this question the cases are many and it is generally held that the term "household" embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character under one roof. The evidence in this case discloses that Sisneros was a roomer and boarder for a period of approximately one week during which time his Ford pickup was incapacitated. The evidence discloses the Ford pickup was repaired and placed in running condition a few days after Sisneros was released from the hospital, following the accident. There is no evidence he remained at the Duran apartment after the pickup was repaired.

Taking into consideration all the evidence heard and the reasonable inferences to be drawn therefrom and interpreting them in such a way to be what I believe to be the truth thereof, I hold the 1957 Ford was a substitute automobile within the terms of the insurance agreement, and used by the insured temporarily during the time the insured's Ford ¾ ton truck was withdrawn from normal use because of its physical unfitness and that the Ford truck was so withdrawn on the date of the accident; that the 1957 Ford was not assigned to Sisneros by Mrs. Duran for his "regular use"; that Sisneros was not a member of the Duran "household". Counsel for defendants will prepare and submit proposed findings of fact and conclusions of law, together with judgment, within twenty-five (25) days from and after the date of this memorandum and the clerk will enter an order accordingly.