JOHN A. ROBERTS, III, Executor of the Estate of DAVID ROBERTS, Deceased, 646 Banbury Road, Dayton, Ohio, Plaintiff

v.

HECTOR L. GONZALEZ and CONQUEST AIRWAYS, INC., and HECTOR GONZALEZ, d/b/a CARIBBEAN EXECUTIVE AIRLINES, INC., and CARIBBEAN EXECUTIVE AIRLINES, INC., and MRS. RAYMOND MARS or JOHN DOE (Designated as such by the lack of knowledge of the true Administrator's name), Administrator of the Estate of RAYMOND MARS, Deceased, Defendants

Civil No. 429-1970

LUTHER BENJAMIN, Administrator of the Estate of CARMEN ELENA BENJAMIN, Deceased and LUTHER BENJAMIN, Administrator of the Estate of NELLIE THERESA BENJAMIN, Deceased and LUTHER and DELIA BENJAMIN and JACQUELINE BENJAMIN, Administratrix of the Estate of EDWARD C. WHEATLEY, Deceased and JOHN A. RICHARDSON, Administrator of the Estate of SEVERINA RICHARDSON, Deceased and LUTHER BENJAMIN, Parent and Natural Guardian of AGNES BENJAMIN, a minor and LUTHER BENJAMIN, in his own right, Plaintiffs

v.

HECTOR L. GONZALEZ AND CONQUEST AIRWAYS, INC., AND HECTOR L. GONZALEZ, d/b/a CONQUEST AIRWAYS, INC., and CARIBBEAN EXECUTIVE AIRLINES, INC., and MRS. RAYMOND MARS or JOHN DOE (Designated as such by the lack of knowledge of the true Administrator's name), Administrator of the Estate of RAYMOND MARS, Deceased, Defendants

Civil No. 408-1969

JOSEPH L. LEDEE, LAURITA A. LEDEE, and KAREL L. PEREZ, Plaintiffs

v.

HECTOR L. GONZALEZ AND CONQUEST AIRWAYS, INC., AND HECTOR L. GONZALEZ, d/b/a CONQUEST AIRWAYS,

571

INC., AND BONITA AIRLINES, INC., d/b/a CARIBBEAN EXECUTIVE AIRLINES, INC., and CARIBBEAN EXECUTIVE AIRLINES, INC., and MRS. RAYMOND PRICE MARS or JOHN DOE (Designated as such by the lack of knowledge of the true Administrator's name), Administrator of the Estate of RAYMOND PRICE MARS, Deceased, Defendants

Civil No. 432-1970

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 13, 1980

ALEXANDER A. FARRELLY, ESQ. (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I., *for plaintiffs*

JAMES E. BEASLEY, ESQ. (BEASLEY, HEWSON, CASEY, COLLERAN & STOPFORD), Philadelphia, Pa., *for plaintiffs*

FREDERICK D. ROSENBERG, ESQ. (BAILEY, WOOD & ROSENBERG), St. Thomas, V.I., *for defendant Caribbean*

ALEX GONZALEZ, ESQ. (DUBON, GONZALEZ & BERRIOS) Hato Rey, Puerto Rico, *for defendant Caribbean*

CHRISTIAN, *Chief Judge*

## OPINION

This matter is before the Court following a hearing to resolve whether the "temporary use of substitute aircraft" provision contained in defendant Caribbean Executive Airlines, Inc.'s (Caribbean) insurance policy covers the plaintiffs' claims. Plaintiff John Roberts originally purchased a ticket to fly via Caribbean but, after

Caribbean's plane malfunctioned, was transferred to a charter flight of defendant Conquest Airways, Inc. (Conquest). The Conquest flight crashed, resulting in the death of Roberts and the decedents of some plaintiffs, such decedents being individuals who were on the ground, and otherwise causing damage and loss to the remaining plaintiffs.

The Court will first address the preliminary question of whether Caribbean is liable to plaintiffs. So doing the Court finds that Caribbean is not liable on the theory that Conquest was Caribbean's agent. Nonetheless, the court does find that Caribbean is liable to the passengers, the basis of that finding being that Conquest had apparent authority to act on Caribbean's behalf. Additionally, the Court will find Caribbean liable to all plaintiffs because Caribbean was a common carrier with a nondelegable duty to plaintiffs.

Once Caribbean is found liable, the Court will address the ultimate issue, the scope of Caribbean's insurance coverage, and in this regard will hold that the Conquest flight was a substitute aircraft within the meaning of Caribbean's insurance policy. Thus, the plaintiffs' claims are covered by that policy.

## FACTS

The Court's findings of fact are gleaned from four sources. The first is the January 15, 1979, hearing on the issues of Caribbean's liability and coverage. (Hereinafter 1979 Hearing.) The second source is the February 24, 1976, hearing on the issue of privity between Conquest and Caribbean. (Hereinafter 1976 Hearing.) The third source is testimony from the 1974 trial in Commercial Insurance of Newark, New Jersey v. Hector Gonzalez and Conquest Airways, No. 60-69 (D.P.R.) on the issue of Conquest's liability and coverage. (Hereinafter 1974 Trial.) The final source is the stipulations proposed by plaintiffs and agreed to by counsel for Caribbean in a letter dated December 12, 1978. (Hereinafter Stipulations.) A transcript of the 1976 Hearing, excerpts from the 1974 Trial and the Stipulations were all admitted in evidence at the 1979 Hearing. Our findings of fact now follow.

Roberts and eight other persons purchased tickets to fly via Caribbean, round trip, between San Juan and St. Thomas on December 6, 1968.[1] Some tickets were purchased from travel agents in San Juan[2] and others were purchased directly from Caribbean

---

[1] Testimony of Edward Stawicki, a passenger, 1974 Trial, p. 66.

[2] Testimony of Phyllis Ziner and Dr. R. McIntire Bridges, passengers, 1974 Trial, p. 307, 695.

at the airport.[3] Each ticket cost $20[4] and included round trip transportation from midtown to the airport in both St. Thomas and San Juan.[5]

On the morning of December 6, 1968, the nine passengers boarded a Caribbean plane in San Juan for their flight to St. Thomas.[6] En route the pilot realized the plane had lost its rear wheel during take-off.[7] He returned the aircraft to San Juan and landed there safely.[8] The plane was then taken out of service.

Caribbean did not have another aircraft available to transport the passengers to St. Thomas.[9] Accordingly, Caribbean arranged for the passengers to be transferred to an unscheduled Conquest flight.[10] This action was taken pursuant to an informal agreement Caribbean had with other air taxis for providing transportation when its own aircraft were unavailable.[11] Caribbean agreed to pay Conquest $135, $15 per passenger, for the round trip between San Juan and St. Thomas.[12] Thus, Caribbean retained $5 per passenger, presumably for supplying ground transportation.

In the course of this transfer the passengers had absolutely no dealings with Conquest.[13] Hence, they retained their Caribbean tickets and made no payment to Conquest. From the perspective of the passengers the transfer was automatic.[14] They noted no

[3] Testimony of Edward Stawicki, a passenger, 1975 Trial, p. 66.

[4] Testimony of Hector Gonzalez, President of Conquest, 1976 Hearing, p. 9.

[5] Testimony of Phyllis Ziner, a passenger and Saul Ziner, Executive Vice-President of Caribbean, 1976 Hearing, p. 309, 343.

[6] Testimony of Edward Stawicki, a passenger, 1974 Trial,.p. 66.

[7] Stipulation 12.

[8] Testimony of Edward Stawicki, a passenger, 1974 Trial, p. 66

[9] Stipulation 10.

[10] Testimony of Saul Ziner, Executive Vice-President of Caribbean, 1974 Trial, p. 342.

[11] Testimony of Hector Gonzalez, President of Conquest, 1976 Hearing, p. 8.

[12] Stipulation 13.

[13] Testimony of Hector Gonzalez, President of Conquest, 1976 Hearing, p. 10.

[14] Testimony of Edward Stawicki, David Gehring, Paul Anster, passengers, 1974 Trial, p. 66, 678, 690. Saul Ziner, Vice-President of Caribbean, testified at the 1974 Trial, p. 342, that the passengers were offered an option of having their money refunded or the making by Carib of alternative arrangements. This does not affect the Court's conclusion because Ziner was not present with the passengers on the plane. Also, even if the passengers had an option, it would appear that a choice of continuing on to St. Thomas would still be viewed as a trip as a Caribbean passenger.

opportunity to elect to make alternative arrangements. Thus, they must have presumed that they were still "Caribbean passengers".

The Conquest plane to which the passengers were transferred was a Beech D-18E aircraft, registration number N 433 AC.[15] The plane was owned, maintained and operated by Conquest.[16] The flight from San Juan to St. Thomas was uneventful.

Late in the afternoon on December 6, 1968, the same nine passengers boarded the identical Conquest airplane for the return trip to San Juan.[17] In addition, there was a tenth passenger, a Mr. Victor Caparros. He had purchased a ticket directly from Conquest.[18]

Shortly after take-off the Conquest aircraft crashed into the homes of Joseph Ledee and Luther Benjamin at Nos. 64 and 65 Estate Contant, St. Thomas, respectively.[19] As a result of the crash, seven persons were killed. They included five plaintiff-decedents: John Roberts, a passenger, as well as Carmen Elena Benjamin, Nellie Theresa Benjamin, Edward C. Wheatley and Severia Richardson, persons present in the Benjamin home.[20] The Ledee claim is for property damage.

Finally, the Court finds that the plane crashed due to an aircraft engine malfunction and the pilot's negligence in dealing with the resulting emergency.[21]

## AGENCY

The first alleged basis for finding Caribbean liable to plaintiffs is that Conquest was acting as Caribbean's agent at the time of the accident. This question of whether a principal-agent relationship existed is governed by the extent of Caribbean's control over the Conquest flight:

> A principal has the right to control the conduct of the agent with respect to matters entrusted to him.

---

[15] Stipulation 2.

[16] Stipulation 15.

[17] Testimony of Edward Stawicki, a passenger, 1974 Trial, p. 67

[18] Testimony of Hector Gonzalez, President of Conquest, 1976 Hearing, p. 9.

[19] Stipulation 6.

[20] Stipulations 5 and 7.

[21] Testimony of Jack Monsanto, aviation expert and witness of the crash, 1979 Hearing.

RESTATEMENT (SECOND) OF AGENCY § 14 (1958); see id. § 1(1).

Once the issue is viewed in this light, it is clear that Conquest was not acting as Caribbean's agent. At most, Caribbean determined the Conquest flight's times of arrival and departure, destinations and passengers. The factors suggesting the absence of control are, however, more persuasive. Conquest furnished its own pilot, plane, fuel and flight plan. Moreover, Conquest had sufficient freedom to take on an additional passenger, Mr. Caparros, on its return flight from St. Thomas to San Juan. There is absolutely no indication that Conquest needed Caribbean's permission to take such action.

Plaintiffs also point to the continuous control Caribbean exercised over the passengers. Their tickets were on Caribbean stock. Also, of the $20 received from each passenger Caribbean paid Conquest only $15. The remaining $5 presumably covered Caribbean's other responsibilities including transportation of the passengers between center-city and the airport in both St. Thomas and San Juan. Moreover, Caribbean took complete charge of the transfer of the passengers to Conquest after the Caribbean plane became inoperable. Also, the passengers never consciously chose to fly via Conquest; they were merely informed of the transfer and tacitly assented. Nonetheless, Caribbean's control over the passengers does not constitute control over Conquest. Hence, the existence of passenger control adds nothing to, or otherwise affects, the Court's analysis.

 Plaintiffs do correctly point out that a finding of an agency relationship does not require absolute control:

> The control of the principal does not, however, include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.

RESTATEMENT (SECOND) OF AGENCY § 14 comment a. Nevertheless, Caribbean's power over the Conquest flight was no greater than that of a charterer.

> A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent contractor.

Id. § 14N comment b. It is this category of non-agent contractor into which Conquest falls.

## APPARENT AUTHORITY

Regardless of the fact that Conquest was not an authorized agent

of Caribbean, as to the nine passengers it was a corporate personality with apparent authority to act on Caribbean's behalf:

§ 8. Apparent Authority

Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.

RESTATEMENT (SECOND) OF AGENCY § 8.

■ Apparent authority results from the manifestation by the principal (Caribbean) to third persons (the nine passengers) that another person (Conquest) was its agent. Id. comment a. Among those manifestations is the total absence of dealings with Conquest by the passengers. Instead, their transfer was conducted entirely by Caribbean officials and, therefore, left the impression that they were still Caribbean's passengers. A similar conclusion is inferable from the fact that the Conquest flight was an unscheduled flight for the Caribbean passengers alone. This perspective was also reinforced by Caribbean's retention of the responsibility for the passengers' ground transportation in San Juan and St. Thomas. A final manifestation of apparent authority was the fact that the passengers were permitted to retain their Caribbean tickets and to utilize them on the Conquest flights.

■ Of course, apparent authority exists only with regard to those who believe and have reason to believe that there is authority. Id. Thus, only the Caribbean passengers and not the victims on the ground benefit from the doctrine. That is because only the passengers were in a position to have a reasonable belief that Conquest was Caribbean's authorized agent.

It is clear, however, that based on the words and conduct cited above the passengers did have such a reasonable belief. They were not in a position to observe the indicia of Conquest's retained control such as by knowing who sold the ticket to the additional passenger. Hence, they could not be deemed constructively aware of Conquest's independent status. In fact, they were much more likely to assume that they were still doing business exclusively with Caribbean, albeit through an agent.

■ The final elements of apparent authority are also present. It is obvious from the discussion of the reasonableness of the passengers' beliefs that Caribbean should have realized that its conduct was likely to create such a belief. Furthermore, it is

established that the passengers relied on that belief because they boarded the ill-fated Conquest flight. Thus, it follows that created in Conquest was the apparent authority to act on behalf of Caribbean:

> Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

Id. § 27. Accordingly, as to the passengers Conquest's apparent authority to act on behalf of Caribbean constitutes a basis for liability. Id. §§ 159, 214.

## COMMON CARRIER

■ Even if Conquest was in no sense Caribbean's agent, Caribbean may still be subject to liability if it employed Conquest as a contractor to perform work for which Caribbean, as a common carrier, had a nondelegable duty to plaintiffs. See Venuto v. Robinson, 118 F.2d 679, 682 (3d Cir.), cert. denied 314 U.S. 627 (1941). RESTATEMENT (SECOND) OF TORTS § 428 (1965) speaks directly to this issue:

> § 428. Contractor's Negligence in Doing Work Which Cannot Lawfully Be Done Except Under a Franchise Granted to His Employer
>
> An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity.

Thus, the existence of four elements are necessary for the determination of Caribbean's liability to plaintiffs under § 428: (1) Caribbean's ability to lawfully operate an air taxi service must have been dependent on a franchise granted by public authority; (2) Caribbean's air taxi service must involve an unreasonable risk of harm to others; (3) Conquest must have been employed by Caribbean to perform air taxi services; and (4) the plaintiffs' injuries must have been caused by the negligence of Conquest in carrying out air taxi services for Caribbean.

■ There is no question that Caribbean's air taxi service required a franchise granted by a public authority. In interpreting

580

the identical requirement of § 428 the United States Court of Appeals for the Third Circuit held that interstate motor carriage is an "activity which can be lawfully carried on only under a franchise granted by public authority." Venuto v. Robinson, 118 F.2d at 679. This conclusion was based on the fact that the Motor Carrier Act of 1935[22] provides for the Interstate Commerce Commission to regulate the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce. There is a parallel act for air carriage, The Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq. It provides for the Federal Aviation Administration and the Civil Aeronautics Board to regulate interstate, overseas or foreign air commerce. Thus, Caribbean's air taxi service falls within the category of common carriers addressed by the first element of § 428. See Alaska Airlines v. Sweat, 568 P.2d 916, 925–26 (Alas. 1977) (applying § 428 to air taxi services).

The second element of § 428, that the activity in question involves an unreasonable risk of harm to others, is also applicable to air taxi services by analogy to Venuto. Venuto held that the carriage of freight on public highways involves the considerable risk to the public specified in § 428. 118 F.2d at 682. Certainly, therefore, the same can be said of air taxi services. The same conclusion is reached by examining Comment a to § 428. It describes the term "unreasonable risk of harm" as an activity "peculiarly dangerous unless carefully operated." This definition clearly encompasses air taxi services. Alaska Airlines v. Sweat, 568 P.2d at 925.[23]

The third requirement of § 428 is that Caribbean employed Conquest to "do work in carrying on" Caribbean's air taxi services. This "employment" need not reach the level of a principal-agent relationship such as the Court previously rejected. Instead, the status of a nonagent independent contractor is sufficient.

Caribbean contends, however, that it had absolutely no employment relationship with Conquest. In effect, Caribbean maintains that once it arranged alternative transportation for the passengers and delivered them to Conquest, the passengers were

---

[22] The Motor Carrier Act of 1935 was amended September 18, 1940, and is now entitled Part II of the Interstate Commerce Act, 49 U.S.C. § 301 et seq.

[23] For a detailed discussion of the term "unreasonable risk of harm" in the Restatement of Torts see Pritchett v. Kimbeling Cove, Inc., 568 F.2d 570, 581–82 (8th Cir. 1977). Pritchett concludes that all common carrier activities involve an "unreasonable risk of harm."

exclusively Conquest's. Accordingly, Caribbean reasons that the Conquest flights were not made on Caribbean's behalf. The Court rejects this analysis, however, and finds that Conquest's air taxi services were performed for Caribbean. We reach this conclusion because Caribbean's relationship with the passengers was never in fact severed and because of the special relationship Caribbean, as a common carrier, had with the passengers. The most forceful indication of Caribbean's continuing relationship with the passengers is that Caribbean never relinquished its obligation to provide all ground transportation for the passengers. In fact, Caribbean retained $5 per passenger, for these services. Another indication of the continuing relationship is the passengers' retention of their Caribbean tickets. They were never reticketed by Conquest. Finally, the fact that the passengers never consented to Caribbean discharging its responsibilities to them evidences an unterminated relationship.

A case directly on point is Rozmajzl v. Northland Greyhound Lines, 49 N.W.2d 501 (Iowa 1951). Northland Greyhound Lines sold bus tickets to several passengers including Rozmajzl. Due to mechanical failure, the Northland bus was unable to make its scheduled run. Northland arranged with Sioux Lines for the furnishing of a bus and driver. The arrangement was an informal one which had been made in the past between the companies when the need for an extra bus arose. Id. at 503. The Supreme Court of Iowa, citing § 428, concluded that on these facts "Northland could not evade its duty to its passengers by engaging its codefendant to perform that duty."[24] Id. The Court reasoned that "Northland's sale of a ticket to plaintiff whereby it agreed to transport her rendered it liable to her for the negligence of the Sioux driver." Id.

The facts in the case at bar are "on all fours" with the factual setting in Rozmajzl. Both cases involve passengers ticketed on one common carrier who are transferred to a chartered common carrier. Both cases involve mechanical difficulties in equipment which prompt the original carrier to contact another carrier pursuant to informal arrangements. Furthermore, in both cases the passengers retained their original tickets. Thus, by analogy to Rozmajzl it is proper to conclude that Caribbean employed Conquest within the meaning of § 428.

■■■ In addition, the policy consideration noted in Rozmajzl relative to the nondelegable duty of a common carrier to its

---

[24] An analogous case involving buses which comes to the same conclusion is Frank Martz Coach Co. v. Hudson Bus Transp. Co., 44 A.2d 488, 491 (N.J. 1945).

passengers is equally applicable in the instant case. This policy is widely relied upon: "[t]he responsibility of a common carrier for the safety of its passengers is so important that the carrier should not be permitted to transfer it to another." Alaska Airlines v. Sweat, 568 P.2d at 926 (airlines); see Southern Railway Co. v. Hussey, 42 F.2d 70, 70 (8th Cir. 1930) (freight trains); Frank Martz Coach Co. v. Hudson Bus Transportation Co., 44 A.2d 488, 491 (N.J. 1945) (buses). Hence, both the facts and public policy demand that Caribbean be subject to liability under § 428. Lastly, the fourth element of § 428 is easily satisfied. The Court has already found that the negligence of the Conquest pilot caused the crash.

Fulfillment of the four requirements of § 428 does not, however, completely clear away all obstacles to a finding of Caribbean's liability. Firstly, we must determine whether Conquest falls within a possible exception to § 428 known as the "equal footing doctrine." Then, if the equal footing exception is inapplicable, we must resolve Caribbean's contention that if § 428 provides for a cause of action at all, it extends only to passengers and not to persons on the ground.

The equal footing doctrine presumes that § 428 is intended to prevent subversion of regulations issued by public authorities which are applicable to common carriers. To reach this presumption we begin by noting the laudatory purposes of the regulations, the protection of the public from irresponsible contractors and the strengthening of safety regulations. See Eli v. Murphy, 39 Cal. 2d 598, 248 P.2d 756, 757 (1952). We then note the loophole. The regulations apply only to common carriers certified or franchised by public authority. Thus, the public might be entirely deprived of these safeguards if the certificate holders or franchisees could evade their responsibilities by employing irresponsible persons as independent contractors. Because § 428 closes this loophole by providing that a common carrier remains liable, the equal footing doctrine's view of § 428's rationale makes sense.

The problem with the equal footing doctrine is the conclusion to which it is susceptible, based on an understanding of the rationale of § 428 which is implicit in that doctrine. In effect, the underlying reasoning of the doctrine is that in those situations in which the independent contractor is also certified or franchised and, therefore, governed by the laudatory regulations, resort to § 428 is unnecessary. The theory is that the purpose of § 428, ensuring that the relevant regulations are complied with, is already fulfilled. Accordingly, the original common carrier need not be held liable.

The interpretation of § 428 as seen in the context of the equal

583

footing doctrine is not wholly without merit. Yet it has been rejected by every court which has considered it. See, e.g., Alaska Airlines v. Sweat, 568 P.2d at 927 n.12; Lehman v. Robertson Truck-A-Way, 122 Cal. App. 2d 82, 264 P.2d 653, 655–56 (Ct. App. Cal. 1953). In addition, other cases which have dealt with § 428 have not even bothered to consider the equal footing doctrine. See, e.g., Rozmajzl v. Northland Greyhound Lines, 49 N.W.2d at 505 (finding the original common carrier liable without a preliminary finding that the independent contractor lacked a license to make the same run). See also Fulton v. Woodford, 498 P.2d 564, 566–67 (Ct. App. Ariz. 1972) (stating that the original common carrier is liable even though the independent contractor had identical licenses). Hence, the consensus view is that the equal footing doctrine is unpersuasive and that the duty of a common carrier is nondelegable. This total rejection of the doctrine is based on the belief that "passengers should be able to look to the carrier with which they contract." Alaska Airlines v. Sweat, 568 P.2d at 927 n.12. Thus, there can be no exceptions to the nondelegable duty rule.

 The final argument of Caribbean, that § 428 benefits only the passengers and not persons on the ground, will be rejected summarily. In illustration I of § 428, an example of how the section should be applied, a common carrier is declared to be liable to a nonpassenger. Also in a case involving freight trucking, the Fourth Circuit Court of Appeals states that § 428 applies to the general public. See War Emergency Co-op Ass'n v. Widenhouse, 169 F.2d 403, 406 (4th Cir. 1948). Finally several circuits have applied § 428 in situations in which the plaintiff was a nonpassenger of the common carrier. See, e.g., Gudjel v. Southern Shippers, Inc., 387 F.2d 723, 725–26 (7th Cir. 1967); Venuto v. Robinson, 118 F.2d 679, 682 (3d Cir. 1941). Accordingly, Caribbean is liable to all plaintiffs under § 428.[25]

## TEMPORARY USE OF SUBSTITUTE AIRCRAFT

The last issue before the Court is a determination of whether Clause IV of Lloyd's insurance policy No. 20594, the policy issued to

---

[25] Reference to Restatements of Law have been frequent and dispositive. This results from the provisions of 1 V.I.C. § 4 which provides:

> The rules of the common law, as expressed in the restatement of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

Caribbean, extends coverage to the Conquest flight. Clause IV reads as follows:

## IV. TEMPORARY USE OF SUBSTITUTE AIRCRAFT

While an aircraft owned by the named Insured (Caribbean) is withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction, such insurance as is afforded by this policy with respect to such aircraft applies also with respect to another aircraft of similar type, horse-power, and seating capacity, not so owned while temporarily used as the substitute for such aircraft. This Insuring Agreement does not cover as an Insured the owner of the substitute aircraft or any agent or employee of such owner.

In interpreting Clause IV, the Court discerns six prerequisites to a finding of coverage. They will be discussed in turn.

Preliminarily, however, it is beneficial to express the rule of construction that will guide the Court in its deliberations. The rule is that a provision for coverage of a substitute vehicle is for the insured's benefit and, therefore, any ambiguous portion is to be construed liberally in the insured's favor. Central National Insurance Co. of Omaha v. Sisneros, 173 F.Supp. 757, 760 (D.N.M. 1959); Van Minos v. Merkley, 48 App. Div. 281, 369 N.Y.S.2d 246, 250 (4th Dept. 1975); State Farm Mutual Automobile Insurance Co. v. Allstate Insurance Co., 3 Cal. App. 3d 508, 88 Cal. Rptr. 246, 251 (Ct. App. 3d Dist. 1970).

The first requirement of Clause IV is that an aircraft owned by Caribbean "is withdrawn from normal use" at the time of the occurrence giving rise to the claim. The fact that the Caribbean aircraft was withdrawn from normal use on the morning of December 6, 1968, is admitted in Stipulations 10 and 11. Caribbean contends, however, that plaintiffs never proved that the aircraft still remained out of service when the crash occurred late in the afternoon of December 6th.

Caribbean's argument is frivolous. It is reasonable to infer that the mechanical problems inherent in the loss of a rear wheel during take-off and the resulting damage when the aircraft landed would take longer than eight hours to repair.[26] In any event, regardless of the validity of that inference it is proper to interpret Clause IV so that the insured had a reasonable period of time after repairs were

---

[26] The Caribbean aircraft returned to San Juan and landed at approximately 10 a.m. The Conquest flight crashed at approximately 6 p.m. the same day.

completed to put the plane back in service. See Norris v. Insurance Co. of North America, 215 S.E.2d 379, 390 (Ct. App. N.C. 1975). For example, in Prudence Mutual Casualty Co. v. Sturms, 185 N.E.2d 366 (App. Ct. Ill. 1962), a student car owner whose car broke down borrowed his father's car to return to college on May 5th. Id. at 367. By May 7th the father had had the son's car repaired. Nevertheless, the son elected to remain at college with his father's car until the semester ended. The son was in an accident on June 1st while returning home from college. Id. at 368. In these circumstances, the Sturms court held that the father's car remained a temporary substitute automobile. It reasoned that if the insurance policy provides no express limitation on the time to retake the vehicle, then the Court will imply a reasonable time. Id. at 270. Clause IV provides no such express time limitation and, therefore, the Court will imply that a reasonable time within which Caribbean could return its aircraft to service and retain coverage would be a minimum of 24 hours.

The second demand of Clause IV is that there be an actual breakdown of Caribbean's aircraft which caused it to be withdrawn from normal use. Stipulation 2 in combination with the discussion above clearly establishes this prerequisite.

The third element of Clause IV is that the alleged substitute aircraft be of "similar type, horse-power, and seating capacity" to the one withdrawn from use. The Court has no difficulty in finding that the two aircraft involved, except for slight variations on the Beech 18 model, were similar within the meaning of Clause IV. See Whittington v. Ranger Insurance Co., 201 S.E.2d 620, 623 (S.C. 1973) (upholding application of an identical clause when a Cessna 172 aircraft was substituted for a Champion Catabria aircraft). This conclusion is particularly valid in light of the rule of construction cited above. In fact, Caribbean's memoranda do not even challenge this requirement.

The fourth prerequisite of Clause IV, that Caribbean may not be the owner of the alleged substitute aircraft, is satisfied by Stipulation 2.

The fifth requirement is that the Conquest aircraft was in fact a substitute for the Caribbean aircraft. In effect, the Caribbean aircraft must have been inoperable and, except for the breakdown, the Caribbean aircraft would have been used in place of the Conquest aircraft. See Western Casualty & Surety Co. v. Norman, 197 F.2d 67; Whittington v. Ranger Insurance Co., 201 S.E.2d at 623. This conclusion follows from Stipulations 10 and 11.

The final requirement, that the Conquest aircraft was "temporarily used as the substitute" for the Caribbean aircraft, involves the most strenuous analysis of the six prerequisites. We have already established

that the Conquest flight was a "substitute" and the fact that it was "temporary" is not questioned. See Stipulation 13. Thus, the crucial issue is what is meant by the word "used". In that regard, the key is the extent of control Caribbean must have had over the Conquest flight to have "used" it. The Court will find that the term "used" encompasses Caribbean's hiring of the Conquest flight.

The strongest support for the Court's interpretation is found in Fulton v. Woodford, 498 P.2d 564 (Ct. App. Ariz. 1972). Fulton involved a temporary use of substitute vehicle provision identical in relevant part to Clause IV. The Fulton court held that the provision covered a truck driven by an independent contractor which was hired to haul material in place of the insured's disabled truck. Id. at 570. Certainly Caribbean's control over the Conquest flight reaches the level of the insured's control of the independent contractor in Fulton.

Moreover, the reasoning in Fulton is highly persuasive in the case at bar. As the Fulton court interprets the term "used" it connotes "a vehicle put in place of another". Id. at 569. Thus, it is "for the same use the insured car would have been used except for its withdrawal from all normal use . . . ." Id. The crucial point in Fulton is that

> [h]ere the undisputed facts indicate Fulton was employing Patterson's truck to perform Fulton's undertaking with Conway. The only reason for the use of Patterson's truck on the day in question was the disablement of one of Fulton's trucks which would have been used, had it been available, to the same extent as was Patterson's truck. Under these circumstances, Patterson's vehicle was a temporary substitute for Fulton's vehicle and therefore insured under the Harleysville policy.

Id. at 570 (citations omitted).

Another convincing case supporting our interpretation is Lumberman's Mutual Casualty Co. v. Harleysville Mutual Casualty Co., 367 F.2d 250 (4th Cir. 1960). In Lumberman's, a father had agreed to transport to and from work people who worked at the same plant as he did in exchange for pay. One morning the father's car wouldn't start and he requested his son to take the son's car and provide the transportation. While fulfilling this request, the son was in an accident. Id. at 252. In interpreting a provision identical in relevant part to Clause IV, the Fourth Circuit Court of Appeals held that the son's car was "temporarily used as a substitute" for his father's vehicle. Id. at 254. Here again, the father's control over his son's car is no greater than that of Caribbean over the Conquest flight.

■ In addition, the reasoning of Lumberman's deals directly with Caribbean's argument that Conquest's sale of a ticket to Victor Caparros implies that Caribbean was not "using" the Conquest flight. The Lumberman's court states,

> [t]rue, Ray may have had his own purposes for the trip aside from his father's, but this does not change the fact that William (the father) was also using the car to do what he would have done with his own.

Thus, the fact that Conquest was able to serve some of its own needs with the flight does not automatically eliminate the conclusion that Caribbean was "using" the flight within the meaning of Clause IV.

It is worthwhile to mention two additional cases adopting the interpretations of Lumberman' s and Fulton. In Western Casualty and Surety Co. v. Norman, 197 F.2d 67 (5th Cir. 1952), another "temporary use as a substitute" phrase was at issue. The Fifth Circuit Court of Appeals held that the vehicle in question was not a substitute because it might have been used even if the insured car was not disabled. Id. at 69. Nevertheless, the reasoning in Norman is relevant because it states that in order to show "temporary use as a substitute" the claimant must show

> not only that the insured vehicle had been withdrawn from service because of a breakdown, but also that *except for this the insured car would have been in use at the time and in the circumstances involved.*

Id. (emphasis added). Similarly, in Lewis v. Bradley, 97 N.W.2d 408 (Wis. 1959), the Court found that a farm tractor was "temporarily used as a substitute" for a car because it was "for the same use the insured car would have been used except for its withdrawal from all normal use . . . ." Id. at 411–12. Accordingly, it is the "but for" standard that controls the interpretation of the word "use" and, therefore, the Conquest flight was being used as a substitute by Caribbean.

Caribbean advocates the much stricter interpretation enunciated in Tanner v. Pennsylvania Thresherman & Farmers' Mutual Casualty Insurance Co., 226 F.2d 498 (6th Cir. 1955). Tanner suggests that the substitution provision only applies if the vehicle is "in the possession or under the control of the insured to the same extent and effect as the disabled car would have been except for its disablement". Id. at 500. This standard is clearly more difficult to satisfy than that the vehicle be "temporarily used to the same extent

as the automobile described in the policy." Lumberman's, 367 F.2d at 255, quoting Pennsylvania Thresherman & Farmers' Mutual Casualty Insurance Co. v. Hartford Accident & Indemnity Co., 310 F.2d 618, 622 (4th Cir. 1962).

This Court rejects the Tanner interpretation. Firstly, Tanner is easily distinguishable from the case at bar as well as the cases previously cited. In Tanner, a brother of the insured was involved in an accident while driving his own car on an errand on behalf of the insured. The insured's car was disabled at the time. En route the brother had picked up his wife and children for a ride. 226 F.2d at 499. Thus, the enterprise only fractionally and remotely touched the insured's interest. See Lumberman's, 367 F.2d at 255. More importantly, the errand was a spur of the moment accommodation; it was not to fulfill any prior undertaking of the insured's. Id., see Fulton v. Woodford, 498 P.2d at 570. Hence, while a stricter standard of "temporary use as a substitute" may be appropriate under the facts set forth in Tanner, it does not govern fact situations such as are present in the case at bar.

Caribbean also stresses the point that "used" implies that its employees must have control of the Conquest flight. Yet, as is clearly stated in Lumberman's, "[t]he provision refers to the vehicle and not to the operator." 367 F.2d at 254. Accordingly, both Lumberman's and Fulton applied substitution clauses in situations where neither the insured nor his agents operated the substitute vehicle. The same interpretation applies to Caribbean and Conquest.

Finally, the Court's somewhat expansive interpretation of term "used" is consistent with the general view of courts analyzing the term in insurance contracts. For example, in Lloyds America v. Ferguson, 116 F.2d 920 (5th Circuit 1941), the Court interpreted a substitution provision almost identical to Clause IV. Although the construction of the policy was solely with regard to a Mississippi statute, the Court did hold that two taxis hired by a bus company to carry passengers were used as temporary substitutes for a disabled bus. Id. at 923. In so holding, the Fifth Circuit expressed its belief that this was the most logical interpretation. Similarly, in United States Steel Corp. v. Transport Indemnity Co., 50 Cal. Rptr. 576 (Ct. App. 3d Cir. 1966), the Court held that U.S. Steel "used" the truck of the insured independent contractor solely by loading it with steel. The Court reasoned that "the word 'use' in an insurance policy must be given a broad, general and comprehensive meaning effectuating broad coverage . . . ." Id. at 584.

Accordingly, for the reasons set forth above the Court finds that

the Conquest flight was "temporarily used as a substitute" for the Caribbean flight and, therefore, that the Lloyd's policy No. 20594 extends coverage to the Conquest flight.

A hearing on the issue of damages will be scheduled for the earliest convenient date.